795 P.2d 1294
**The STATE of Arizona, Appellant,**

v.

**Lee Allan BULLINGTON, Appellee.**

**No. 2 CA–CR 89–0657.**

Court of Appeals of Arizona,
Division 1, Department B.

July 24, 1990.

Stephen D. Neely, Pima County Atty. by Kathleen Quigley, Tucson, for appellant.

Tracy G. Ragsdale, Tucson, for appellee.

OPINION

FERNANDEZ, Chief Judge.

The state appeals from the trial court's granting of appellee's motion to suppress money seized from a vehicle driven by appellee. The state also contends that the trial court heard inadmissible evidence at the suppression hearing. We affirm.

On May 22, 1989 around 11:00 a.m., Officer Cook of the Tucson Police Department received a telephone call from 88–CRIME. He was told that a confidential informant had provided detailed information about a narcotics transaction that was to occur later that day. The informant stated that there were four people in town from Ohio who were attempting to purchase $24,000 to $26,000 worth of marijuana. The informant named the four as Lee Bullington, his brother Frank Bullington, Frank's wife Laura Bullington, and Ted. Ted and appellee were reported to be staying in room 227 at the Holidome at 4550 South Palo Verde and to be driving a rented blue van with an Ohio license plate number, 153–ULX.

The informant indicated that Frank and Laura were staying in room 328 at the Marriott Courtyard near the airport. They were reported to be driving a rented white over red convertible. The informant stated that the four people were negotiating the purchase of marijuana with a person named Casimir Zalewski and a Hispanic male named Carlos.

According to the informant, Ted and appellee were to drive the marijuana back to Ohio in the blue van once the transaction was completed, and Frank and Laura were to return by airplane. The informant did not know where or at what time the transaction was to occur, only that it would occur on May 22. The informant also stat-

ed that the people from Ohio had previously negotiated with Carlos and another Hispanic male on May 20 in the parking lot at the Holidome. The negotiations had reportedly broken down because Carlos and the other man were unable to deliver the marijuana. The informant indicated that another meeting had taken place in room 328 at the Marriott on May 21, but the parties had again incurred delivery problems. Negotiations were said to have been rescheduled for May 22 and involved a purchase of 50 pounds of marijuana.

Shortly after Officer Cook spoke to 88–CRIME, Detective Simmons went to the Holidome and located a blue van with an Ohio license plate numbered 153–ULX. He checked the Holidome's registration for room 227 and found it was occupied by Neddal Bahhur from Ohio. Detective Simmons also went to the Marriott Courtyard, but the hotel manager refused to tell him who was registered in room 328.

The police officers then began a surveillance of the blue van at 1:50 p.m. At 2:26 p.m., Officer Cook observed two males get into the van and pull out of the parking space. The vehicle stopped, the passenger got out, opened the trunk, and apparently looked through a suitcase. The van then left the parking lot and drove north on Palo Verde. The police observed the van driving at different speeds, speeding up, slowing down, and making several quick lane changes. At Broadway, the van turned eastbound and drove to Elliott's Big and Tall Men's Store. The van stopped in the parking lot, and both occupants entered the store. Approximately ten minutes later, the two men left the store with nothing in their hands, got back into the van, and again proceeded eastbound on Broadway, driving in the same manner as they had on Palo Verde.

At one point, the van drove into a parking lot by a restaurant, where the occupants sat for a moment, looked around, and then drove eastward again. The officers lost the vehicle for a short while but picked it up again in the parking lot of a fast food restaurant farther east. The driver was seen looking around, and then the vehicle again proceeded east on Broadway. Because the supervising officer had twice had eye contact with the driver, he testified that he decided to have the van stopped by uniformed officers, which occurred at Broadway and Wilmot. Using a public address system, the officer ordered both occupants to put their hands on the roof of the van. The passenger complied, but the driver was seen first reaching to the roof and then bending over as though he were reaching under the seat before he complied with the order. Another officer testified that the bending down occurred before the van was stopped by the police.

The men were identified as Lee Bullington and Neddal Bahhur. After they were handcuffed, arrested for conspiracy to violate the narcotics laws, and placed in separate police vehicles, the van was moved some 70 yards to a parking lot and was searched. The officer first looked in an ice chest in the trunk area where he found food. He then looked under the front seat, found a shopping bag, and pulled it out ten inches so he could look inside it. A large amount of cash was in the bag.

Appellee was indicted for conspiracy to commit a class 2 felony, that of unlawful transportation of marijuana for sale. At the suppression hearing, appellee testified and the court listened to a taped statement by Neddal Bahhur. The court granted appellee's motion to suppress the money found in the van.

The state contends that based on the totality of the circumstances, the police had reasonable suspicion to stop and probable cause to search the van and that a warrantless search of the van was proper. The state also contends that the court erred in considering inadmissible evidence at the suppression hearing.

### PROBABLE CAUSE

■ This case began with an informant's tip to 88–CRIME. The standard for determining probable cause in situations involving informants is a "totality-of-the-circumstances" analysis. *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527, 543 (1983). That analysis

"permits a balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip." *Id.* at 234, 103 S.Ct at 2330, 76 L.Ed.2d at 545. According to *State v. Graciano*, 134 Ariz. 35, 37, 653 P.2d 683, 685 (1982), the assessment of all the circumstances

> may be based upon some degree of subjectivity involving the application of the officer's training and experience, plus any number of objective factors such as the modes or patterns of operation of certain kinds of lawbreakers, the officer's observation of suspicious conduct, the suspect's presence near the scene of a recent crime and information received from informers or other officers.

The assessment, however, "does not include a weighing of the officer's 'unparticularized suspicions' or hunches about a suspect or situation." *Id., quoting Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889, 909 (1968).

An investigatory stop of a motor vehicle is permitted if, after the police officers have assessed all the circumstances, they have a "particularized suspicion ... that the particular individual being stopped is engaged in wrongdoing." *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981). The scope of the permissible search of a motor vehicle, legitimately stopped and which the police have probable cause to believe contains contraband, is co-extensive with the scope of a search authorized by a properly issued search warrant. *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

Turning around and walking back to one's car after viewing a police officer has been held insufficient to sustain an investigatory stop. *State v. Master*, 127 Ariz. 210, 619 P.2d 482 (1980). In *State v. Will*, 138 Ariz. 46, 672 P.2d 1316 (1983), the supreme court affirmed the trial court's suppression of evidence, finding that the police lacked probable cause to stop a vehicle driven by the girlfriend of a known drug dealer who drove through a parking lot slowly.

In this case, the officers followed a van that matched the informant's description, but they had no description of the men involved and had not verified that either appellee or a man named Ted occupied room 227. They had not verified any information about the other people allegedly involved in the transaction. Officer Cook conceded that the police did not have probable cause to arrest the men at the time they began following the van. Yet, nothing else occurred before the stop except the van's "erratic" driving and its stopping at a men's clothing store and the parking lots of two restaurants. Thus, we agree with the trial court's finding that the officers lacked a particularized suspicion of criminal activity that would warrant the stop of the van. In light of that finding, the officers also lacked probable cause to search the van.

We note that after the briefs were filed in this case, the United States Supreme Court decided *Alabama v. White*, —— U.S. ——, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). In that case, the police received an anonymous tip

> that Vanessa White would be leaving 235–C Lynwood Terrace Apartments at a particular time in a brown Plymouth station wagon with the right taillight lens broken, that she would be going to Dobey's Motel, and that she would be in possession of about an ounce of cocaine inside a brown attache case.

*Id.* at ——, 110 S.Ct. at 2414, 110 L.Ed.2d at 306–307. The police went to the apartments, saw a woman leave building 235 in the described vehicle at the time stated, and drive four miles on the most direct route to Dobey's Motel. The Court concluded that the tip and the corroboration resulting from the officers' surveillance was sufficient to provide reasonable suspicion so as to warrant a *Terry* stop. *Terry v. Ohio, supra.*

In so holding, the Court stated, "We think it also important that, as in *Gates,* 'the anonymous [tip] contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted.' " *Id.*

— U.S. at ——, 110 S.Ct. at 2417, 110 L.Ed.2d at 310, *quoting Illinois v. Gates*, 462 U.S. at 245, 103 S.Ct. at 2335–36, 76 L.Ed.2d at 552. The tip in this case, unlike that in either *White* or *Gates*, involved details only as to existing facts; there were no details as to appellee's future actions. Therefore, the tip here did not supply sufficient information to warrant a stop of the van. We also note that, unlike here, the subsequent vehicle search in *White* was consensual.

## ADMISSIBILITY OF EVIDENCE

 The state contends in its opening brief that the trial court erred in permitting appellee to testify at the suppression hearing and in listening to a taped statement of Bahhur. It does not mention the issue in its reply brief. We note initially that during a discussion on scheduling, defense counsel informed the court that he would be playing the tape and that appellee would be testifying. The prosecutor objected to the use of the tape because she had not been present at the interview but said nothing about appellee's testimony. After the lunch recess, the prosecutor again objected to use of the tape, this time on the ground it was inadmissible hearsay, but still said nothing about appellee. Following a lengthy discussion about the tape, the tape was played, a recess was taken, and appellee took the stand. It was not until after the prosecutor had begun her cross-examination that she then belatedly objected to his testifying. In light of that record, we find that the state waived its objection to appellee's testimony.

With regard to the tape, we first observe that the state has neither produced the tape for us on appeal nor informed us of its contents. Thus, we are unable to determine how the state was prejudiced by its use, even if it were erroneously admitted. We also note that despite the trial court's statement in the minute entry that she considered the tape in determining her ruling, she also made the following statement when the state belatedly objected to appellee's testimony: "Frankly, I don't think any of Mr. Bullington's testimony is relevant or Mr. Bahhur. I think I need to make my decision on entirely what I heard, what the police officers did or did not do." In view of our determination that the trial court correctly granted the motion to suppress, we find that the use of the tape was, at worst, harmless error.

Affirmed.

HOWARD and LIVERMORE, JJ., concur.