### UNITED STATES of America

v.

### Ronald T. CLIPPER, Appellant.

#### No. 91–3126.

United States Court of Appeals, District of Columbia Circuit.

Argued April 9, 1992.

Decided Sept. 4, 1992.

Robert L. Tucker, Asst. Federal Public Defender, with whom A.J. Kramer, Federal Public Defender, Washington, D.C., was on the brief, for appellant.

Cynthia G. Wright, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and David E. Mills, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before BUCKLEY, WILLIAMS, and D.H. GINSBURG, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

In responding to a police broadcast, two officers found Ronald T. Clipper at the location and wearing the clothing described to the police in an anonymous telephone call. The informant reported that the man had a gun. The officers stopped Clipper and subjected him to a weapons pat down. Although no gun was found on him, the stop led to the discovery of cocaine and to Clipper's subsequent conviction of possession with intent to distribute. We are asked to decide whether these facts could give rise to the reasonable suspicion required to justify a *Terry* stop and search. We conclude that they could have, and affirm the conviction.

## I. BACKGROUND

On September 26, 1990, at approximately 4:30 p.m., the District of Columbia Metropolitan Police received an anonymous call reporting that a black male armed with a gun was in the area of First and U Streets, N.W. According to the caller, the individual was wearing a green and blue jacket and a black hat. Officers Sherrie E. Bonner and Eric Andre Jones were patrolling in the vicinity and heard the police dispatcher's broadcast of a "look out" for an armed man. Proceeding rapidly to the area, the officers observed an individual matching the description of the man.

The officers left their car, identified themselves as police officers, and asked the individual, Clipper, to put his hands on a nearby fence. Officer Bonner testified that she had her weapon drawn at the time, as she feared that Clipper had a gun. Officer Bonner then ordered Clipper to turn around and place his hands on the fence.

Officer Jones proceeded to frisk Clipper for a weapon. Officer Jones felt a bulge in Clipper's right jacket pocket that he "thought [ ] might have been the weapon that we was supposed to have been looking for.... [T]hen I reached my hand inside and see what it was and pulled it out, and it was the money." Suppression Hearing Transcript, Feb. 28, 1991 ("S.T.") at 51. After retrieving a thick wad of currency, Officer Jones asked Clipper why he was carrying so much money; Officer Bonner, however, told Officer Jones to continue the pat down. Upon resuming, Officer Jones felt another bulge in Clipper's crotch area that he "thought [ ] was the gun." *Id.* at 52. "At that point, ... Mr. Clipper threw his hands up, and knocked the money out of Officer Jones's hand[.]" *Id.* at 10. Clipper then fled.

The officers caught Clipper after a brief chase, and during the ensuing struggle, the officers observed a brown paper bag containing crack cocaine in Clipper's hand. They recovered the bag and placed Clipper under arrest. No gun was found.

Clipper moved to suppress the money and drugs, claiming, *inter alia*, that the police did not have the reasonable suspicion required for a *Terry* stop and search. District Judge Gasch denied the motion. *See United States v. Clipper,* 758 F.Supp. 756 (D.D.C.1991). Relying on our decision in *United States v. White,* 648 F.2d 29, 45 (D.C.Cir.), *cert. denied,* 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233, 235 (1981), Judge Gasch held that

> the officers had a fair description of the defendant and the direction in which he was walking. The important detail transmitted to them by the dispatcher was that he was armed. When confronted with an armed suspect, more direct action is required. Protective action is required by the officers for their safety and for that of people in the area. It must always be emphasized that the action of the police must be reasonable; it must be prompt. Here, the officers were confronted with a man who fit the description given by the dispatcher who was believed to be armed.

*Clipper,* 758 F.Supp. at 761.

After a jury trial, Clipper was convicted of possession of cocaine base with intent to distribute and sentenced to seventy-five months in jail. On appeal, Clipper brings three challenges to the district court's denial of his motion to suppress: (1) the anonymous tip did not provide the police with reasonable suspicion to stop him; (2) the stop was done improperly, transforming the encounter into an illegal arrest; and (3) the frisk of his person exceeded permissible bounds, constituting a search without probable cause.

## II. DISCUSSION

### A. Reasonable Suspicion

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court established that, consistent with the Fourth Amendment, police may stop an individual for brief questioning and perform a protective search based upon a reasonable suspicion that the suspect is engaged in criminal activity and a reasonable belief that he is armed. The *Terry* Court upheld a stop and protective frisk that led to the discovery of weapons. The reason-

able suspicion was provided by the officer's observations of defendants' conduct in "casing" a jewelry store. *Id.* at 27–31, 88 S.Ct. at 1883–85.

Four years later, in *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Supreme Court considered whether an informant's tip, verified by law officers as to certain details, could give rise to a reasonable suspicion. In holding that the tip justified the officer's stop, the Court stressed that the informant was known to the officer and had provided him with reliable information in the past. *Id.* at 146–47, 92 S.Ct. at 1923. The Court did not decide whether information given anonymously could ever justify a stop. *Id.* at 147, 92 S.Ct. at 1923.

In two separate opinions in 1981, we answered that question in the affirmative. In *United States v. White, supra,* police received an anonymous telephone call reporting that

a young black man known as "Nicky," about 19 or 20 years old, wearing a blue jumpsuit with white stripes, had parked a 1971 Ford LTD in front of No. 1 15th Street, N.E., entered a 1974 Oldsmobile four door, and driven away in it. The caller identified the color of the Ford, and supplied the license tag numbers of both cars. He concluded by stating that "Nicky" and the unidentified driver of the Oldsmobile were involved in narcotics traffic and would be "dirty" with drugs when they returned.

*United States v. White,* 648 F.2d at 30–31 (citations omitted). Acting on the tip, the police found the described Ford parked in front of No. 1 15th Street. The Oldsmobile returned shortly, as predicted, and parked behind the Ford. Three individuals were in the Oldsmobile: a driver, Orson White; a black male passenger in a blue sweatsuit, Lawrence Anderson; and a child in the rear seat. The officers approached the Oldsmobile and announced: "Police, get out of the vehicle." *Id.* at 31. The officers observed White remove an item from his pocket. When he got out of the car, it fell to the ground. The officers retrieved the object, which contained heroin, and placed White

and Anderson under arrest. A subsequent search of the car revealed other drugs and paraphernalia. *Id.* at 31–32.

We found that when "credibility is enhanced by the responding officer's observation of corroborating details[,] an anonymous tip may provide a legitimate basis for a stop, and in some cases, an arrest." *Id.* at 41. "The difficult question," we continued, "is how much corroboration is necessary to justify an intrusion of the suspect's Fourth Amendment rights." *Id.* In this regard, we noted both that the tip "was quite specific" and that "it described a pattern of behavior on the suspects' part." *Id.* at 40–41. Based on these facts, we held

that an anonymous tip about an ongoing transaction, detailed as to time and place, including a specific description of one of the participants and their vehicles as well as their modus operandi, and verified by the officers through surveillance in all details ... provides a sufficient basis for a legitimate *Terry* stop[.]

*Id.* at 43.

Our second case, *United States v. McClinnhan,* 660 F.2d 500 (D.C.Cir.1981), involved a gun tip, not a drug tip. Police received an anonymous telephone report that a black male wearing jeans, a black hat, and a black coat was carrying a sawed-off shotgun in a black briefcase near 16th and Crescent Streets, N.W., in the District of Columbia. Officers drove to the area and observed a man matching the reported description standing one foot away from a black briefcase. The police approached the man, McClinnhan, identified themselves, and conducted a frisk. A later search of the briefcase uncovered a sawed-off shotgun. *Id.* at 501.

We upheld the stop and frisk as supported by reasonable suspicion, despite the less detailed nature of the tip and the fact that it was wholly descriptive. Relying on *United States v. White, supra,* we stated that "while [the tip] lack[ed] facial indicia of reliability, [it] was corroborated in every significant detail by [the officers'] pre-stop surveillance." *Id.* at 502. And while we recognized that "it is possible for anyone with a grudge to fabricate a tip whose

neutral details ... would provide the corroboration required by the *White* decision," we concluded that the particular circumstances of the case justified the stop and search:

> Either [the police] stopped McClinnhan on the basis of the tip as corroborated by their observation or they could at best follow him through the streets of Washington hoping he would commit a crime, or at least brandish the weapon, out of doors, rather than walking inside a dwelling, and thus beyond police purview, before putting the shotgun to its intended use. Either they ignored their reasonable suspicion, or they took some action. We think that where their suspicion has some objective foundation, the Fourth Amendment does not, particularly where the reported contraband is a weapon as lethal as a sawed-off shotgun, require a police officer to ignore his well-founded doubts and accordingly will permit an investigative detention.

*Id.* at 502–03.

■ To summarize, these cases hold that an anonymous tip can be the basis for a *Terry* stop if it has been subject to corroboration sufficient to provide police officers with "legitimate reasons to believe that the tip was reliable." *Id.* at 502 (citing *United States v. White*). In *McClinnhan*, we made the further point that where the tipster, whose information is otherwise sufficiently corroborated, informs the police that the suspect is armed, the police are justified in proceeding with a frisk for weapons. *Id.* at 503. What constitutes sufficient corroboration, of course, will depend on the facts of each case.

The Supreme Court recently agreed with our analysis in *United States v. White* concerning the police's ability to act on anonymous information involving drugs. *See Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). In *Alabama v. White*, the police received an anonymous tip that White would be leaving apartment 235–C Lynwood Terrace Apartments at a particular time in a brown Plymouth station wagon with a broken right taillight, that she would be driving to Dobey's Motel, and that she would be in possession of about one ounce of cocaine inside a brown attaché case. *Id.* at 326, 110 S.Ct. at 2414. Officers went to the apartment building, where they observed White leave in a station wagon matching the above description. She was carrying nothing when she entered the car. They followed her as she drove in the most direct route towards the motel. Before she reached the motel, the police stopped White and asked if they could look for cocaine. She consented, and in the ensuing search, the officers recovered three milligrams of cocaine from her purse, and marijuana from an attaché case they discovered in the car. *Id.* at 327, 110 S.Ct. at 2414–15.

The Supreme Court found that the tip, as corroborated by the police, had given rise to a reasonable suspicion. The Court "conclude[d] that when the officers stopped respondent, the anonymous tip had been sufficiently corroborated to furnish reasonable suspicion that respondent was engaged in criminal activity[.]" *Id.* at 331, 110 S.Ct. at 2416. While noting that not every detail had been corroborated (the police did not see White leave the particular apartment, she was not carrying an attaché case, and the police stopped her before she reached the motel), the Court found that the main facts had been confirmed. *Id.* at 331, 110 S.Ct. at 2416–17. Moreover, the Court also found it "important that ... the anonymous [tip] contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." *Id.* at 332, 110 S.Ct. at 2417 (internal quotation marks and citation omitted). The Court explained:

> What was important was the caller's ability to predict respondent's *future behavior*, because it demonstrated inside information—a special familiarity with respondent's affairs. The general public would have had no way of knowing that respondent would shortly leave the building, get in the described car, and drive the most direct route to Dobey's Motel. Because only a small number of people

are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities.

*Id.* (emphasis in the original).

■ Clipper argues that *Alabama v. White* undermines our decision in *McClinnhan.* According to him, *Alabama v. White* requires that an anonymous tip contain information predicting future behavior and that the police confirm the accuracy of the prediction before they may assume the tip is sufficiently reliable to act upon. While *United States v. White* would survive this reading of the Supreme Court's decision (the tipster in that case predicted that the described Oldsmobile would return to the address given the police), *McClinnhan* would not, because in that case the only information given was descriptive. Clipper maintains that his Fourth Amendment rights have been violated because the tip in his case was not predictive; therefore, the police could not have had the level of suspicion required to justify the stop.

We believe that Clipper misreads *Alabama v. White.* The Court in that case did not depart from its well-established "totality of the circumstances" test; nor did it adopt a categorical rule requiring the corroboration of predictive information as a precondition to reliance on anonymous tips. Indeed, the Court specifically described its inquiry as focusing on the "totality of the circumstances":

> Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the totality of the circumstances—the whole picture[.]

*Alabama v. White,* 496 U.S. at 330, 110 S.Ct. at 2416 (internal quotation marks and citation omitted). Moreover, the Court observed that

> reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is

different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Id.*

While it is true that the Court said, in that case, that the police's ability to corroborate the informant's predictions was important, *Alabama v. White* does not establish a categorical rule conditioning a *Terry* stop (when police are acting on an anonymous tip) on the corroboration of predictive information. The Supreme Court in that case dealt with information that a particular individual was in possession of drugs, not of a gun. Moreover, the Court did not repudiate or narrow its prior holdings defining the circumstances under which a *Terry* stop may be made. To the contrary, it built on its prior decisions dealing with the nature of the reasonable suspicion that would justify a stop under the Fourth Amendment.

Clipper tries to buttress his argument with citations to several state cases that purportedly read *Alabama v. White* as requiring anonymous tips to include, and the police to corroborate, predictive information. *See Commonwealth v. Lyons,* 564 N.E.2d 390, 393 (Mass.1990); *Johnson v. State,* 197 Ga.App. 538, 398 S.E.2d 826, 827 (1990); *State v. Bullington,* 165 Ariz. 11, 795 P.2d 1294, 1296 (1990); *Hardy v. Commonwealth,* 11 Va.App. 433, 399 S.E.2d 27, 28 (1990); *State v. Bedolla,* 111 N.M. 448, 806 P.2d 588, 591–92 (1991) (subsequent history omitted). All but one of these cases, however, were concerned with drugs, not guns. Significantly, the exception, *Hardy,* which involved a gun *and* drug tip, did not hold the frisk for weapons unconstitutional under the Fourth Amendment, but merely invalidated a later search for drugs. *See Hardy,* 399 S.E.2d at 28–29.

We believe that the totality of the circumstances to which the Court refers in *Alabama v. White* must include those in which the anonymous informant makes no predictions, but provides the police with

verifiable facts while alerting them to an imminent danger that the police cannot ignore except at risk to their personal or the public's safety. In short, we believe that *McClinnhan* remains valid law.

This conclusion reflects the Supreme Court's long-standing approach to Fourth Amendment jurisprudence. Any fair reading of *Terry* and its progeny reveals that those decisions involve a careful balancing of interests. As the Supreme Court stated in *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), *Terry*

> weigh[ed] the interest of the individual against the legitimate interest in "crime prevention and detection," ... and the "need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest."

*Id.* at 1047, 103 S.Ct. at 3479 (quoting *Terry*, 392 U.S. at 22, 24, 88 S.Ct. at 1880, 1881). Of course, the interest of the individual detained and frisked pursuant to either a drug tip or a gun tip will not fluctuate; in either case, he seeks to avoid an "intrusion upon cherished personal security." *Terry*, 392 U.S. at 25, 88 S.Ct. at 1882. But the Government's interest in protecting its law officers and the public will reflect the nature of the criminal activity reported by the informant.

The unique dangers presented to law officers and law-abiding citizens by firearms are well chronicled. A recent press release from the Federal Bureau of Investigation offers the following statistics on the number of officers killed by firearms last year:

> Sixty-nine law enforcement officers were killed feloniously in the line of duty during 1991, according to preliminary national figures released today by FBI Director William S. Sessions. The total is 4 higher than the 1990 annual count of 65.
>
> Firearms continued to be the weapon most used in the slaying of officers. During 1991, handguns were used in 48 of the murders, rifles in 14, and shotguns in 4.

Federal Bureau of Investigation, Press Release 1 (1991). Assaults on law officers with firearms are common: In 1987, 2,789 officers were attacked with firearms. *See* Federal Bureau of Investigation, Uniform Crime Reports, Law Enforcement Officers Killed and Assaulted 39, 43 (1987) ("LEOKA Report"). More than seven hundred of these assaults occurred while an officer was responding to a disturbance call, such as a report of a man with a gun. *Id.* at 43. The statistics for Washington, D.C., are significantly worse on a per capita basis. There were 151 recorded assaults on the D.C. police in 1989, 219 in 1990, and 162 during the first six months of 1991 alone. *See* Ruben Castaneda, *D.C. Police Say Streets are Meaner*, Washington Post, Oct. 8, 1991, at B1.

Statistics, of course, cannot tell the entire story. Typical examples of individual shootings of officers include the following:

> * At approximately 9:45 p.m. on September 22, a 35–year–old officer with the New York City Transit Authority was shot and killed while investigating a man-with-gun complaint. (LEOKA Report at 31 (1987))
>
> * A 17–year veteran officer of the Chicago Police Department was shot and killed upon responding to a man-with-gun call at approximately 3:15 p.m. on April 3. Wearing plain clothes and driving an unmarked squad car, the officer and his partner were the first to arrive at the scene of the disturbance. As he was exiting his vehicle, the 48–year–old officer was fatally shot in the head with a .30–06–caliber rifle. (LEOKA Report at 29 (1986))
>
> * Upon responding to a man-with-gun call at a local residence, the Chief of the Trafford Police Department [in Alabama]—a one-officer agency—was shot and killed at approximately 8:30 p.m. on May 21. (*Id.* at 30)

This violence has not been limited to police officers. In 1990, the total number of murders in the United States reached 23,438. Of these, 12,847 involved the use of a firearm. In the District of Columbia, there were 472 murders and non-negligent manslaughters in 1990, a rate of 77.8 killings for every 100,000 residents. *See* Federal

Bureau of Investigation, Uniform Crime Reports, Crime in the United States 9, 12, 61 (1990). The recent story of a sixteen-year-old boy killed and five other youths wounded in a shooting outside a high school dance in the city is a painful reminder of the epidemic of violence that grips the metropolitan area. *See* Nancy Lewis, *9 Are Slain in D.C. Area In 2 Days,* Washington Post, June 1, 1992, at A1.

■ The hazards that the illegal use of firearms presents to officer and citizen alike are well documented. Therefore, a police officer responding to a tip involving guns may properly take these hazards into consideration when balancing the suspect's interests against the "need for law enforcement officers to protect themselves and other prospective victims of violence[.]" *Terry,* 392 U.S. at 24, 88 S.Ct. at 1881. As we pointed out in *McClinnhan,* an officer who has been able to corroborate every item of information given by an anonymous informant other than actual possession of a weapon is faced with an "unappealing choice." *McClinnhan,* 660 F.2d at 502. He must either stop and search the individual or "at best follow him through the streets ... hoping he [will] commit a crime, or at least brandish the weapon, out of doors," where the police can intervene. *Id.* at 502–03.

This element of imminent danger distinguishes a gun tip from one involving possession of drugs. If there is any doubt about the reliability of an anonymous tip in the latter case, the police can limit their response to surveillance or engage in "controlled buys." Where guns are involved, however, there is the risk that an attempt to "wait out" the suspect might have fatal consequences.

■ Here, as in *McClinnhan,* the police received an anonymous tip providing a detailed description of the appearance, clothing, and location of a man who reportedly possessed a weapon. Officers at the scene were able to corroborate all of the innocent details of the tip. In these circumstances, we conclude that a reasonable trier of the facts could find that the officers had a reasonable suspicion sufficient to justify a *Terry* stop and search.

While we continue to be mindful "that it is possible for anyone with a grudge to fabricate a tip whose neutral details, such as clothing or location, would provide the corroboration required" by our precedent, *see id.* at 502, we are aware that anyone fabricating information runs a risk. Telephone calls to police stations are generally recorded, and the making of fraudulent reports is punishable by law. *See, e.g.,* D.C.Code § 4–151 (1988). Clipper has failed to cite any case or offer any evidence to suggest that the District of Columbia police have reason to discredit anonymous tips. Absent affirmative evidence of abuse, we cannot ignore society's plain interest in protecting its members, and those who serve them, from armed and dangerous persons.

### B. Use of a Gun in the Stop

■ Clipper next argues that Officer Bonner had drawn her weapon when she made the stop, converting it into an unlawful arrest. In *United States v. White,* we noted that courts have considered the following circumstances, among others, in determining whether a stop or an arrest has occurred:

> the officer's intent in stopping the citizen; the impression conveyed to the citizen as to whether he was in custody or only briefly detained for questioning; the length of the stop; the questions, if any, asked; and the extent of the search, if any, made.

*United States v. White,* 648 F.2d at 34 (citations omitted).

Given the facts in this case, we have no difficulty in finding that the detention was a stop. The officers testified that they intended only to briefly stop Clipper and quickly frisk him for weapons. They never told him that he was under arrest. The encounter was brief; no handcuffs or other restraints were used; and the frisk itself was limited to an outer pat down and the removal of a bulky object from Clipper's pocket.

The fact that Officer Bonner had drawn her weapon does not alter our conclusion that the encounter was a stop. In *United States v. Laing*, 889 F.2d 281 (D.C.Cir. 1989), *cert. denied*, 494 U.S. 1069, 110 S.Ct. 1790, 108 L.Ed.2d 792 (1990), we upheld a detention at gunpoint as a *Terry* stop, not an arrest. We found that the officers had "reasonably believe[d]" the use of guns was necessary for their safety and that of others. *Id.* at 285. *See also United States v. White*, 648 F.2d at 34–35 ("Courts have generally upheld stops made at gunpoint when the threat of force has been viewed as reasonably necessary for the protection of the officer."). In this case, we find that the information that Clipper was armed made it reasonable for Officer Bonner to believe that it was necessary for her to draw her weapon. *See Laing*, 889 F.2d at 286.

### C. Scope of the Search

Finally, Clipper challenges the bounds of the pat down conducted by the police, claiming that Officer Jones acted improperly in removing the money from his person, and that this action converted the entire operation into an illegal search. Under *Terry*, police may only search for weapons. *See Terry*, 392 U.S. at 29–30, 88 S.Ct. at 1884. When an officer retrieves an object that is not a weapon, the question to ask is whether the officer reasonably believed it to be one—that is, "whether there was anything in the officer's perception to indicate it was not a weapon either because of its size or density." 3 W. LaFave, Search & Seizure § 9.4(c) at 521 (2d ed. 1987) (internal quotation marks and citation omitted).

 It is clear from the record that Officer Jones reasonably believed the object could have been a gun. He stated that he felt a "large lump" in Clipper's pocket, which he "thought [ ] might have been the weapon that we was supposed to have been looking for." S.T. at 51. He acknowledged, however, that when his hand was in Clipper's pocket, he realized the object was not a gun, but removed it anyway. Thus, while Officer Jones acted within the scope

of *Terry* in reaching into Clipper's pocket to remove the object, its actual removal may well have gone beyond it.

 But even if the extraction of the money was improper, the entire search was not poisoned. The removal of the money did not lead to the discovery of the drugs. The officers had not finished the frisk, as they still had to determine whether Clipper was armed. It was, in fact, in furtherance of the *Terry* pat down that Officer Jones found the bulge in the area of Clipper's crotch. It was this discovery that precipitated the flight that gave the officers probable cause to arrest him. We conclude that in light of the totality of the circumstances, the removal of the money neither converted the stop into an arrest nor required the suppression of the evidence.

### III. CONCLUSION

For the foregoing reasons, the conviction is

*Affirmed.*