**UNITED STATES of America**

v.

**Thomas COOPER, Defendant.**

**No. 97 CR. 733 DC.**

United States District Court, S.D. New York.

Nov. 18, 1997.

---

Mary Jo White, U.S. Atty. for the Southern District of New York by Joshua Berman, Asst. U.S. Atty., New York, NY, for U.S.

Steven M. Statsinger, The Legal Aid Society, New York, NY, for Defendant Thomas Cooper.

## OPINION

CHIN, District Judge.

On June 25, 1997, defendant Thomas Cooper was a patron in a small grocery store in the Bronx. Federal agents entered to execute a warrant that authorized a search of the premises for firearms. The agents saw Cooper standing near the counter and they decided, for security reasons, to pat him down. When they did so, they discovered a loaded revolver in his possession. They therefore arrested him.

Cooper moves to suppress the firearm and his post-arrest statements on the grounds that the search was conducted in violation of his rights under the Fourth Amendment to the United States Constitution. Cooper contends that the agents had no reasonable basis for suspecting that he had committed, was committing, or was about to commit an offense. The government argues that the search was a constitutionally permissible pat-down undertaken as a reasonable protective measure. For the reasons that follow, I conclude that the circumstances relied on by the government to justify the search of Cooper were insufficient. Accordingly, Cooper's motion is granted and the firearm as well as his post-arrest statements are suppressed.

### THE FACTS

The undisputed facts are as follows.[1] On June 24, 1997, federal agents received information from a confidential informant regarding the unlawful storage, distribution, and use of firearms at the "24–Hour Deli," a small grocery store in the Bronx. The confidential informant had previously provided reliable information to the police, including information that led to three arrests and indictments and seizures of stolen motor vehicles.

The confidential informant told police that two days earlier, on June 22, 1997 at 2:30 a.m., three unidentified men entered the 24–Hour Deli. One of the men motioned with his hand to an unidentified store employee standing behind the counter, with a gesture

---

1. The parties have agreed that there is no dispute as to the facts relevant to this motion and that the Court may decide this motion on the agreed facts without an evidentiary hearing. Accordingly, I decide this motion on the undisputed facts set forth herein.

that appeared to simulate pulling the trigger of a gun. In response, the store employee reached below the counter, removed three firearms, and handed them to the three men.

Armed with the three firearms, the three men left the grocery store. One of the men fired shots at another group of men down the street. The three men then re-entered the grocery store, and returned the three weapons to the unidentified employee behind the store counter. The store employee then returned the firearms to an area behind the counter that appeared to be the same location from which he had earlier removed them.

The confidential informant described the three firearms as a semi-automatic assault weapon and two semi-automatic pistols. His information regarding the firearms transaction at the grocery store was corroborated by two independent reports to the police, both made at 3:15 a.m. on June 22, 1997, of a shooting in the vicinity of the grocery store.

Based on this information, federal agents obtained a search warrant from Magistrate Judge Leonard Bernikow on June 25, 1997 at 6:23 p.m., authorizing a search of the "24–Hour Deli" located on the ground floor at 28101 White Plains Road, Bronx, New York, for semi-automatic assault weapons and any other evidence of federal firearms violations.

On the evening of June 25, 1997, agents of the Federal Bureau of Investigation and officers of the New York Police Department executed the search warrant at the grocery store. According to the complaining agent, the law enforcement officers conducted a "security sweep" upon entering the store. At the time, Cooper was standing near the front of the store, next to the front counter. The officers detained Cooper, patted him down, and recovered from him a .38 caliber Rossi revolver, loaded with five rounds of ammunition. The serial numbers had been obliterated from this firearm.

Cooper was one of four patrons in the store, all standing near the front counter. Cooper was closest to the counter. The officers conducted the same patdown of the other three individuals, but no contraband was found on them. Nor did execution of the

search warrant uncover any weapons behind the store counter. A handgun was found, however, in a suitcase in the basement of the store.

After his arrest, Cooper was advised of his constitutional rights. He waived his rights and stated, in substance, that he owned the gun and was carrying it for his own protection. He further stated that after purchasing the gun, he noticed that the serial numbers had been scratched off.

On June 26, 1997, Cooper was charged in a complaint with possessing a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k).

## DISCUSSION

### A. Applicable Legal Standards

#### 1. Terry Stops

The Fourth Amendment prohibits only unreasonable searches and seizures. *See Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989); *see also United States v. Blue*, 78 F.3d 56, 59 (2d Cir.1996). In determining the reasonableness of a search, a court balances the intrusion on an individual's privacy interests against the government's interest in conducting the search. *See Maryland v. Buie*, 494 U.S. 325, 331, 110 S.Ct. 1093, 1096–97, 108 L.Ed.2d 276 (1990). While a search generally may not be conducted without a warrant issued upon probable cause, in some circumstances neither a warrant nor probable cause is required. *Id.*

 The *Terry* case created one such exception to the probable cause requirement, "an exception whose narrow scope [the Supreme Court] has been careful to maintain." *Ybarra v. Illinois*, 444 U.S. 85, 93, 100 S.Ct. 338, 343, 62 L.Ed.2d 238 (1979) (internal quotations omitted). Under *Terry* and its progeny, an investigating officer may briefly detain an individual for questioning so long as the officer has "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot'." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20

L.Ed.2d 889 (1968)). Such a limited stop does not offend the Constitution, even though probable cause for arrest may be lacking. *See United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir.1992).[2] In addition, the officer may then frisk the individual for weapons if the officer reasonably believes that person to be armed and presently dangerous. *See Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972); *Terry*, 392 U.S. at 21–24, 27, 88 S.Ct. at 1879–82, 1883; *see also Glover*, 957 F.2d at 1009.

Circumstances giving rise to sufficiently "specific and articulable facts" to warrant a stop and patdown include: exhibiting suspicious behavior such as watching a store in preparation for robbing it, *see Terry*, 392 U.S. at 6–7, 88 S.Ct. at 1872; appearing to be driving while intoxicated, *see Michigan v. Long*, 463 U.S. 1032, 1050, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201 (1983); owning or occupying private premises for which a search warrant has been obtained, *see, e.g., Michigan v. Summers*, 452 U.S. 692, 702–04, 101 S.Ct. 2587, 2594–95, 69 L.Ed.2d 340 (1981) (officers executing warrant for search of house may detain resident for duration of search); *Rivera v. United States*, 928 F.2d 592, 606–07 (2d Cir.1991); *United States v. Vigo*, 487 F.2d 295, 298 (2d Cir.1973) (upholding protective search of purse of passenger in car of person being arrested); or entering onto private premises while an authorized search is in progress, *see, e.g., United States v. Salazar*, 945 F.2d 47 (2d Cir.1991) (upholding patdown of an individual who, *inter alia*, matched informant's description of narcotics dealer and entered premises from which informant said drugs were being distributed).[3]

The Supreme Court has declined, however, to extend the *Terry* doctrine to a defendant who was stopped in a public place and who had no known connection to a person at that location whom the officers had articulable grounds to suspect of wrongdoing. *See Ybarra*, 444 U.S. at 92–96, 100 S.Ct. at 342–45; *see also United States v. Jaramillo*, 25 F.3d 1146, 1152–54 (2d Cir.1994) (finding patdown of unsuspicious person present in bar during raid of the bar unjustified under *Terry* and its progeny)

Cooper argues that the search of his person was unconstitutional and that the gun seized from him should be excluded on the authority of *Ybarra* and *Jaramillo*. More specifically, Cooper argues that the officers had (1) no particularized probable cause to suspect him of criminality, (2) no specific and articulable facts on which to reasonably suspect him of wrongdoing, and (3) no articulable reason to suspect that he posed a danger to the officers on the scene. Conceding that the issue raised by Cooper is a close one, and that "at first blush [this authority] appear[s] to lend substantial support to his position" the government argues that *Ybarra* and *Jaramillo* are distinguishable from the instant case in critical respects, and that "existing case law and strong policy considerations support the constitutionality of the limited protective pat-down of the defendant here."

---

**2.** Reasonable suspicion requires that the officers be "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the individual was engaged in criminal activity. *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581–82, 45 L.Ed.2d 607 (1975). Probable cause, on the other hand, requires evidence that would give a reasonable person grounds to believe that a crime has been committed by the person arrested. *See, e.g., Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 412–13, 9 L.Ed.2d 441 (1963). While both are objective standards, the reasonable suspicion standard is clearly less stringent than the probable cause standard. *See United States v. Vasquez*, 638 F.2d 507, 520 (2d Cir.1980)

**3.** In addition, in certain circumstances law enforcement officers may, without probable cause or reasonable suspicion, conduct protective sweeps incident to lawful arrests to ensure their safety. *See Buie*, 494 U.S. at 334, 110 S.Ct. at 1098. Thus, an officer effecting an arrest may lawfully "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* Also, if an officer reasonably concludes that an individual poses a danger to those at the scene of the arrest, the officer may neutralize the threat of physical harm by a quick search for weapons within the "grab area" of that individual. *See United States v. Hernandez*, 941 F.2d 133, 137 (2d Cir.1991) (upholding protective sweep of those parts of an arrested defendant's apartment that were within the reach of another individual in the apartment); *see also Blue*, 78 F.3d at 59 (protective sweep conducted incident to in-home arrest exceeded permissible scope by including areas beyond potential grab area of detainees).

(Gov't Mem. at 6). In light of these arguments, a close reading of *Ybarra* and *Jaramillo* is warranted.

### 2. *Ybarra*

In *Ybarra*, law enforcement officers had received information from a previously reliable informant that a particular bartender at the Aurora Tap Tavern was selling heroin from the bar, and they obtained a warrant authorizing the search of the tavern and that bartender. In executing the warrant for the tavern, the officers conducted patdown searches of each of the approximately one dozen customers present at the time, including Ybarra. An Illinois statute authorized officers executing such a warrant to search any person on the premises to protect themselves from attack or to prevent the disposal or concealment of items described in the warrant. The first patdown of Ybarra revealed that he was carrying what felt to the officer like " 'a cigarette pack with objects in it,' " *Ybarra*, 444 U.S. at 88, 100 S.Ct. at 341 (quoting officer's testimony); shortly thereafter, a second search of Ybarra was conducted, the pack was seized, and it was found to contain a substance later determined to be heroin.

The State argued generally that the *Terry* "reasonable belief or suspicion" standard should be applied to the evidence-gathering function of the search warrant. More specifically, the State urged that the search of Ybarra be upheld as constitutional on the grounds that it was conducted "on 'compact' premises subject to a search warrant" and the police reasonably believed that the persons searched were connected with drug trafficking and " '[could] be concealing or carrying away the contraband.' " *Id.* at 34, 88 S.Ct. at 1886.

The Supreme Court rejected the State's arguments and ruled that the search of Ybarra and the seizure of the contents of his pocket contravened the Fourth and Fourteenth Amendments. The Court explained its analysis as follows:

> Upon entering the tavern, the police did not recognize Ybarra and had no reason to believe that he had committed, was committing, or was about to commit any offense under state or federal law. Ybarra made no gestures indicative of criminal conduct, made no movements that might suggest an attempt to conceal contraband, and said nothing of a suspicious nature to the police officers. In short, the agents knew nothing in particular about Ybarra, except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale.

*Id.* at 90–91, 100 S.Ct. at 342. Ybarra was not recognized as a person with a criminal history, nor did the police have any particular reason to believe he might assault them. *Id.* at 93, 100 S.Ct. at 343. As the Court summarized:

> Ybarra, whose hands were empty, gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening.... In short, the State is unable to articulate any specific fact that would have justified a police officer at the scene in even suspecting that Ybarra was armed and dangerous.

*Id.* The Court concluded that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.* at 91, 100 S.Ct. at 342. Nor was the frisk of Ybarra supported by the reasonable belief that he was armed and dangerous, the necessary predicate to a patdown of a person for weapons. *Id.* at 92–93, 100 S.Ct. at 342–43. The Court emphasized that:

> [t]he "narrow scope" of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion *directed at the person to be frisked*, even though that person happens to be on premises where an authorized narcotics search is taking place.

*Id.* at 94, 100 S.Ct. at 343 (emphasis added)

### 3. *Jaramillo*

In *United States v. Jaramillo*, 25 F.3d 1146 (2d Cir.1994), the Second Circuit reviewed the circumstances surrounding the

patdown of a patron present in a bar when law enforcement officers conducted raid and observed two other individuals tossing a gun around. The Second Circuit, reversing the district court, found *Ybarra* controlling and concluded that "the government had failed to show that there was any reasonable articulable suspicion directed toward Jaramillo in particular." *Id.* at 1152–53. Accordingly, the *Jaramillo* Court vacated the judgment of conviction and remanded the matter for further proceedings.

The circumstances in *Jaramillo* were as follows. Law enforcement officers, acting on a tip from a confidential informant that a "kidnapping and a killing" were to take place in the La Taverna bar in Queens, New York, raided the bar and performed patdown searches of everyone in the bar, including Luis Jaramillo. The first officer to enter the bar saw one individual "take a handgun from his waistband and toss it into the lap of another person seated at his table; the second person promptly tossed the gun to the floor." *Id.* at 1147. After the police recovered the tossed gun, Jaramillo came out of the bathroom, which was about twelve feet from the table where the two gun tossers were sitting. The police searched Jaramillo and recovered a .380 semi-automatic pistol concealed under his pants leg. *Id.* at 1147–48.

At the suppression hearing, the government chose not to rely on the confidential informant's information about the alleged kidnapping and killing, and instead relied solely on the tossed gun incident as the basis for the agents' reasonable suspicion to patdown Jaramillo. "There was no testimony that Jaramillo was recognized by the officers, or acted in any suspicious manner, or was known to have any connection with [ ] the gun tosser." *Id.* at 1149. Nonetheless, the government argued that the searches of the bar patrons were authorized under *Terry*, "because they constituted merely 'a protective sweep' in order 'to protect the police,'" while Jaramillo argued that the gun seized from him should be excluded on the authority of *Ybarra*. *Id.* at 1150.

The district court found that there were grounds for reasonable suspicion that Jaramillo was armed and dangerous:

the agents knew that at least one gun was in the La Taverna bar and that at least two of the patrons with a relationship to each other had sought to hide it. The place was a neighborhood bar in Corona, Queens County, where it would not be surprising if some of those who frequent it are known to each other. It hardly seems unreasonable to suspect under the circumstances that a person who comes out of a men's room within a few feet of two gun handlers would have some connection with them and might also be armed.

*United States v. Jaramillo*, 822 F.Supp. 118, 120 (E.D.N.Y.1993), *vacated*, 25 F.3d 1146 (2d Cir.1994). The district court concluded that "in a contained area in which a gun had already been found on individuals possibly connected with the person patted down," the officers "were entitled to have a reasonable suspicion that defendant was armed and dangerous." *Id.* at 121. The district court distinguished *Ybarra* as follows:

The *Ybarra* case is not comparable. There no gun was present. Nothing was immediately evident that suggested violence. There was no suggestion that the bartender was armed or anyone else in the bar was armed to protect a major drug conspiracy or a large cache of heroin. The bartender gave every appearance of being a small time drug retailer.

*Id.* at 120–21.

On appeal, the Second Circuit first reviewed *Terry* and its progeny. Then, it summarized the law regarding patdowns as follows:

a *Terry*-type patdown is permissible with respect to persons who are believed, on the basis of specific and articulable facts, to have behaved suspiciously or with respect to persons who own, occupy, or enter upon private premises on which the officers have the right to conduct a search or make a security check; but such a patdown is not permissible with respect to a person in a public place where the officers have no specific and articulable facts on which to base a suspicion of that person in particu-

lar. The difference lies in the fact that while it is obviously reasonable to believe that individuals in a private home or vehicle have some connection with one another, it is not reasonable to assume that all of the persons at a public bar have such a connection. The sole fact that an individual as to whom the officers have no reasonable and articulable suspicion of wrongdoing happens to be in a public place where another person possesses a weapon or contraband does not provide a basis for a *Terry*-type search if the possessor is a person with whom the searched individual has no known connection.

*Jaramillo,* 25 F.3d at 1152. The Second Circuit emphasized that the only "specific and articulable" facts the government could point to in *Jaramillo* were the fact that the agents were "concerned," and the potential danger arising from the unrecovered gun, an assertion than was factually mistaken because an officer had in fact retrieved the gun from the floor. *Id.* at 1153. These "facts" were plainly inadequate. Likewise, the Second Circuit rejected as a matter of law each of the rationales put forth by the district court, and specifically found that (1) there was no evidence of the "possible connection" between the two men; (2) La Taverna's operation as a neighborhood bar did not reasonably lead to the conclusion that "if one patron is seen engaging in suspicious activity it is reasonable to expect all others"; and (3) there was no significance to the fact that the gun tossers' table was near the bathroom from which Jaramillo emerged. *Id.* at 1153. Accordingly, the Second Circuit concluded that the motion to suppress should have been granted. *Id.* at 1154.

## B. *Application*

█ Cooper argues that his case is "absolutely indistinguishable from *Ybarra*," and that the officers here had no particularized probable cause to suspect him of criminality. (Def. Mem. at 3–4). Cooper emphasizes several critical similarities with *Ybarra*. First, he was a customer in a store at which the officers executed a warrant to search the premises, just as Ybarra was in the tavern. The search warrant in each case authorized a search of the store and not its customers.

Second, like Ybarra, Cooper "made no gestures indicative of criminals conduct, made no movements that might suggest an attempt to conceal contraband, and said nothing of a suspicious nature" to the officers. Finally, as in *Ybarra,* Cooper maintains that the officers had no particularized information about him beyond his presence in a public place at the time the police had reason to suspect the store clerk had contraband.

The government attempts to distinguish *Ybarra* by arguing that the narcotics at issue there did not pose the same immediate and potentially fatal threat to the safety of the officers as did the loaded firearms at issue here. While, this argument gives me some pause, ultimately, in the circumstances of this case, I am not persuaded.

The government's position is not without some support. "The unique dangers presented to law officers and law-abiding citizens by firearms are well chronicled." *United States v. Clipper,* 973 F.2d 944, 950 (D.C.Cir.1992). Thus, in applying the totality-of-the-circumstances test for determining reasonable suspicion under *Terry* to an informant's tip involving guns, consideration should be given to "the possibility of the possession of a gun, and the government's need for prompt investigation." *United States v. Bold,* 19 F.3d 99, 104 (2d Cir.1994); *see also Clipper,* 973 F.2d at 951 (officer responding to gun tip may consider hazards of firearms in balancing suspect's interests against need to protect officers and others from violence). This element of imminent danger has been held to distinguish a gun tip from one involving possession of drugs. *See Clipper,* 973 F.2d at 951.

At the same time, however, it is clear that when drugs are present, guns are likely to be present as well. The Second Circuit has repeatedly noted, albeit in a different context, that drug dealers commonly "keep firearms on their premises as tools of the trade." *United States v. Wiener,* 534 F.2d 15, 18 (2d Cir.1976); *see United States v. Vegas,* 27 F.3d 773, 778–79 (2d Cir.1994); *United States v. Fernandez,* 829 F.2d 363, 367 (2d Cir.1987). That being so, police officers executing a search warrant for drugs typically assume—for good reason—that weapons are

also likely to be present. Hence, while the nature of the tip in this case gave the agents more reason to proceed with caution, *Ybarra* is not distinguishable merely because the tip there mentioned only drugs.

Moreover, in this case, a significant amount of time—three and a half days—had elapsed since the shooting incident. Cooper was one of at least dozens, if not hundreds, of customers who had shopped in this neighborhood grocery store over that time period. His appearance at the counter on June 25, 1997 was not sufficiently proximate in time to the distribution of the firearms to raise a reasonable suspicion that he had been involved or that he presented a palpable threat of harm.

Finally, the government's reasoning in this respect is precisely the reasoning that the Second Circuit rejected in *Jaramillo*. There, the district court had denied the suppression motion precisely on the basis that guns were involved while no gun was present in *Ybarra*. *Jaramillo*, 822 F.Supp. at 120–21. The Second Circuit rejected this argument, holding that the presence of weapons did not obviate the government's obligation to show "specific and articulable" facts justifying stopping and patting down Jaramillo. *Jaramillo*, 25 F.3d at 1154.

Next, the government contends that other factors present here, not present in *Ybarra*, give rise to a reasonable articulable fear of danger. Specifically, the government points to the fact that neither the employee distributor nor the shooter of the weapon had yet been identified and the fact that Cooper was standing in front of the counter near where the guns were reportedly stored. I am not persuaded that these circumstances constitute "specific and articulable" facts on which to reasonably suspect Cooper either of wrongdoing or of posing a potential danger to the officers on the scene.

No individuals who handled the stashed weapons (much less Cooper) were identified in the search warrant. Upon entering the grocery store, the officers did not recognize Cooper and had no basis to believe that he had committed, was committing, or was about to commit any crime. Cooper made no gestures indicative of criminal conduct, made

no movements that might suggest an attempt to conceal contraband, and said nothing of a suspicious nature to the officers. He simply stood near the counter when the agents entered the store, a public place, and raised his hands in the air when ordered by the agents to do so. There was nothing tying Cooper to the stash of firearms. Cooper was on the customer side, and not the employee side, of the checkout counter in question. His mere presence there, without more, is hardly sufficient to arouse suspicion. The fact that the agents did not know the entire universe of individuals involved in the possession, distribution and firing of the weapons does not dispense with the requirement for individualized suspicion, nor did it give the agents license to search everyone present in the store.

■ The government suggests that this case is the "entirely different" and exceptional case contemplated by the *Jaramillo* Court. The government relies on the following language in *Jaramillo*:

This case would perhaps have taken on an entirely different character if the government had relied on, and established the reliability of, the confidential information that initially led the agents to raid La Taverna. Trustworthy information of a planned kidnapping and execution could well provide a basis for a reasonable belief that there would be several armed persons on the premises and perhaps give rise to inferences as to other pertinent facts.

*Id.* at 1154. There is nothing in this discussion to signify a relaxation of the ordinary requirement of individualized suspicion. Thus, to the extent the government contends that even in the absence of any particularized suspicion of a person present in a public place, police officers may pat down that person as a limited protective step to minimize the threat of physical harm during their execution of a search warrant for that public place, that view is incorrect.

■ While exigent circumstances are certainly relevant to the balancing of the intrusion on an individual's privacy interests against the government's interest in conducting the search, the circumstances here were not sufficient to justify the search of Cooper. The presence—or potential presence—of

guns always creates a certain degree of exigency. But that presence, without more, cannot automatically justify a patdown of any and all persons who happen to be present at the scene in a public place. Here, there was no reasonable basis to believe Cooper was connected to the firearms, if indeed there were any firearms, or that he was doing anything other than shopping for an evening snack and, again, three and a half days had elapsed since the shooting incident occurred. Accordingly, in the absence of any particularized reason to suspect Cooper of involvement in criminal activity or of posing some danger, I find that the search of Cooper violated the Fourth Amendment. The gun recovered from him during the search is therefore suppressed.

The post-arrest statements made by Cooper must also be suppressed as fruits of the illegal search, because the statements were made by Cooper after the revolver was recovered from him and he was placed under arrest, and directly as a result of those actions. *See Wong Sun v. United States,* 371 U.S. 471, 491, 83 S.Ct. 407, 419, 9 L.Ed.2d 441 (1963); *see also United States v. Knoll,* 16 F.3d 1313, 1321 (2d Cir.1994).

### *CONCLUSION*

Cooper's motion to suppress the firearm and the post-arrest statements is granted.

SO ORDERED.