**UNITED STATES of America, Plaintiff,**

v.

**Steven BOLD, Defendant.**

**No. 92 CR 1335 (ERK).**

United States District Court,
E.D. New York.

June 24, 1993.

## MEMORANDUM AND ORDER

KORMAN, District Judge.

On November 20, 1992, an anonymous 911 caller reported that three black males were sitting inside a gray, four door Cadillac parked in the White Castle parking lot on the corner of Pennsylvania and Wortman Avenues in Brooklyn, a "high crime area." According to the caller, one of the car's occupants wore a hooded sweatshirt and was armed with a gun. The police dispatcher broadcast this information at 4:20 p.m. and three law enforcement officers responded promptly. New York City Housing Authority Police Officers Ferris and Brown, the first two who arrived at the scene, observed a "beat-up" gray Cadillac in the southwest corner of the small parking lot, eight parking spaces away from the restaurant. They parked their patrol car some distance behind the vehicle, at an angle that they hoped would block any escape by the Cadillac and simultaneously enable them to approach on foot without being seen.

As the two officers approached, they observed that all of the windows, including the rear windshield, were darkly tinted. The tinted glass made it impossible to see inside the vehicle.[1] When they got to the passenger side of the car, Officer Brown opened the unlocked rear door, observed two men sitting in the front seat, and ordered them out of the vehicle. When he gave that command— "Gentlemen, please step out of the car"—he could not see the hands of the passenger or "what was in the front seat." Suppress Hr'g Tr. at 25–26, April 27, 1993.

In response to Officer Brown's command, the two men "did not hesitate to open the [front] door" as Officer Brown "moved to close the [rear] door." *Id.* at 26. When the passenger, Scott Burt, opened up his door, Officer Brown "could see him and his hands and ... his lap and he stepped right out" of the Cadillac. *Id.* As Burt stepped out of the car, Officer Brown observed a pile of cash falling from Burt's lap and from under his sweatshirt. A frisk of Burt disclosed that he was unarmed.

Zachary W. Carter, U.S. Atty., E.D.N.Y., Brooklyn, NY by Judith Leib, Asst. U.S. Atty., for plaintiff.

Legal Aid Soc., Federal Defenders Unit, Brooklyn, NY by Thomas Farrell, for defendant.

---

1. Although the front windshield of the Cadillac was not tinted, the car was parked up against a ten-foot opaque fence that made it impossible for the police officers to see through the windshield.

A contemporaneous frisk of Steven Bold, who exited from the driver's side, revealed that he also was unarmed.[2] Nevertheless, Bold was escorted to the front of the vehicle and held, spread-eagle, over the hood. Bold was forced to remain in this restrained position for almost twenty-five minutes until the officers ultimately placed him under arrest. He was permitted to stand normally only when he was questioned briefly by other law enforcement officers who responded to the scene.

Shortly after the two occupants were removed from the vehicle, Officers Fusco and Kuhlmeier of the 75th precinct joined their fellow officers in the parking lot. Peering into the open doors of the Cadillac, Officer Fusco observed a large quantity of cash strewn all over front floor and seat. He also observed on the front floor what initially appeared to be a handgun, but was later determined to be only a toy. When Fusco questioned Bold about these items, Bold explained that he had just "hit the numbers" and that the toy gun belonged to his son.

While some of the other officers on the scene proceeded to conduct a more extensive search of the vehicle for weapons, Officer Kuhlmeier approached Bold and asked him to produce his license, registration, and insurance information. When Bold informed him that he could not produce these items, Kuhlmeier took defendant's wallet and searched it for some other form of identification. The search uncovered various credit cards bearing different names as well as two picture IDs, each bearing a picture of Bold, but imprinted with a different name.

Sometime during the encounter, Officer Kuhlmeier recalled hearing about a bank robbery that had occurred earlier on his tour of duty. Because of the possible connection between the robbery and the cash in the Cadillac, he radioed for a description of the robbery suspect and was told that the suspect was a thin black male, approximately 6' 1" tall, wearing a long tweed overcoat and carrying a briefcase. Having discovered both a long tweed overcoat as well as a briefcase in the back seat of the Cadillac, the officers placed Bold and Burt under arrest.

The two men were indicted subsequently for bank robbery. Burt pled guilty and is currently awaiting sentencing. Steven Bold, however, filed a pretrial suppression motion which turns principally on the propriety of the forced removal of Burt from the Cadillac. While Bold was also ordered out of the Cadillac, his forced removal did not lead to the discovery of the critical evidence in this case. On the contrary, the most critical piece of evidence—the cash that was in the Cadillac—was observed when Burt was removed from the car. The cash falling from under Burt's sweatshirt constituted a suspicious circumstance suggesting the possibility that it may have been obtained in a robbery. Because the possession of a gun is often associated with the commission of such an offense, the observation of the cash lent credence to the anonymous caller, *cf. Adams v. Williams,* 407 U.S. 143, 148, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1973), and provided a sufficient basis to examine the passenger compartment of the Cadillac. *See Michigan v. Long,* 463 U.S. 1032, 1051, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201 (1983). This search led to the discovery of additional cash, the toy gun and other incriminating evidence.

■ The threshold issue, therefore, is whether Bold has standing to object to the order to Burt to get out of the car. Even if the forced removal occasioned by this order constituted a seizure of Burt, it did not constitute a seizure of Bold. Nevertheless, Bold was using the Cadillac with the permission of its owner and was present there when the doors to the vehicle were opened. Under these circumstances, the opening of the rear door of the Cadillac by Officer Brown and the opening of the front passenger door occasioned by Burt's forced removal from the Cadillac invaded an area in which Bold enjoyed a reasonable expectation of privacy. *See United States v. Perea,* 986 F.2d 633, 641–42 (2nd Cir.1993) (a courier carrying a duffel bag, which did not belong to him and which he had no right to use, had a reasonable expectation of privacy that was invaded

---

**2.** Bold exited the Cadillac under the direction of Officer James Lavin who had arrived at the White Castle at the same time as the two Housing officers.

when the duffel bag was opened). Indeed, even if Bold was aggrieved only by his forced removal from the car and the subsequent frisk, it could provide a basis to suppress his statements and the items taken from his wallet.

█ Because Bold may object to the evidence offered here, if it was obtained in violation of the Fourth Amendment, the suppression motion turns on the resolution of the issue of whether the information from the anonymous caller gave rise to the "reasonable suspicion" required for the police officers to open the doors of the Cadillac and order the occupants out so they could be frisked.

"Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990). Notwithstanding this less demanding standard, the *White* Court made it clear that an anonymous tip may provide a basis for reasonable suspicion only if (1) the tip contains " 'a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted' ", *id.* at 332, 110 S.Ct. at 2417 (quoting *Illinois v. Gates*, 462 U.S. 213, 245, 103 S.Ct. 2317, 2335, 76 L.Ed.2d 527 (1983)) and (2) "independent corroboration by the police of significant aspects of the informers predictions." *Id.*[3]

The anonymous tip in this case does not suffice to establish reasonable suspicion under the standard set out in *Alabama v.*

*White.* To the extent that it could be corroborated, the tip contained details relating to an easily obtained fact existing at the time of the tip, i.e., the presence of the Cadillac in the White Castle parking lot. The caller did not predict any future behavior of the occupants of the Cadillac and there were no other circumstances present here that tended to corroborate the tip that one of the occupants of the vehicle was carrying a weapon. The law enforcement officers had no prior information about the subjects, *see Ballou v. Massachusetts*, 403 F.2d 982, 986 (1st Cir.1968), *cert. denied*, 394 U.S. 909, 89 S.Ct. 1024, 22 L.Ed.2d 222 (1969), there were no significant observations made at the scene that lent credence to the information supplied by the anonymous caller, *see United States v. Salazar*, 945 F.2d 47, 50–51 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct.1975, 118 L.Ed.2d 574 (1992); *People v. Benjamin*, 51 N.Y.2d 267, 271, 434 N.Y.S.2d 144, 414 N.E.2d 645 (1980), and the car was not parked on a specific street known for the criminal activity reported by the informant, *see Gomez v. United States*, 597 A.2d 884, 887 (D.C.App.1991); Emily J. Sack, Note, *Police Approaches and Inquiries on the Streets of New York: The Aftermath of People v. DeBour*, 66 N.Y.U.L.Rev. 512, 557 (1991) ("there is a tremendous difference between designating an entire neighborhood a general 'high crime area' and pinpointing a specific street corner or building known for drug sales").[4]

The anonymous caller did not even allege that the possession of the gun was illegal. Under New York law, only the unlicensed possession of a gun is a crime. *N.Y. Penal Law* § 265.20(a)(3) (McKinney 1989). Indeed, "the total number of pistols and revolvers listed on all New York City Pistol Licenses is 121,137." Memorandum of Captain William J. Kenny, Executive Officer, NYPD Li-

---

**3.** The corroboration of such predicted behavior is significant, even where that behavior may itself appear to be innocent, because an informant shown to be right about some things, "is probably right about other facts he has alleged, including the claim that the object of the tip is engaged in criminal activity." *Alabama v. White*, 496 U.S. at 331, 110 S.Ct. at 2416.

**4.** The Cadillac here was parked eight spaces away from the White Castle and it was the only vehicle present in the small lot in the late afternoon. While the United States Attorney argues that this was a suspicious circumstance which tended to confirm the information provided by the anonymous caller, it is not clear precisely why the location of the car in the lot lends credence to the tip.

cense Division (June 18, 1993). Even if the regulatory scheme in New York would justify a forcible stop to determine whether one reasonably suspected of possessing a gun had a license to do so,[5] the information relied upon by the police here was not sufficient to give rise to reasonable suspicion that the occupants of the Cadillac possessed a gun.

The only reason for any further discussion is the holding of the Court of Appeals for the District of Columbia Circuit in *United States v. Clipper*, 973 F.2d 944 (D.C.Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1025, 122 L.Ed.2d 171 (1993). In *Clipper*, the police received an anonymous call that a black male wearing a green and blue jacket and a black hat was in the vicinity of First and U Streets, N.W. The caller went on to warn that the individual was carrying a gun. *Id.* at 946. The police responded to the scene and observed a man matching in every respect the description given by the anonymous caller. *Id.* With guns drawn, the officers stopped and frisked the defendant. *Id.*

Challenging the validity of the stop, the defendant argued that the police did not have reasonable suspicion to detain him. Specifically, he asserted that an anonymous tip must "contain information predicting future behavior and that the police [must] confirm the accuracy of the prediction before they may [rely upon it]." *Id.* at 949. The Court of Appeals rejected this argument and distinguished *Alabama v. White* on the ground that the tip there related to the possession of drugs while the tip in the case before it involved a gun:

> We believe that the totality of the circumstances to which the Court refers in *Alabama v. White* must include those in which the anonymous informant makes no predictions, but provides the police with verifiable facts while alerting them to an imminent danger that the police cannot ignore

except at risk to their personal or the public's safety....

> Th[e] element of imminent danger distinguishes a gun tip from one involving possession of drugs. If there is any doubt about the reliability of an anonymous tip in the latter case, the police can limit their response to surveillance or engage in 'controlled buys.' Where guns are involved, however, there is the risk that an attempt to 'wait out' the suspect might have fatal consequences.

*Id.* at 949–51.

*Clipper* is distinguishable from the present case because the police officers there were able to "corroborate every item of information given by an anonymous informant other than the actual possession of a weapon." *Id.* at 951. The law enforcement officers here were only able to verify the fact that there was a gray, four-door Cadillac parked in the White Castle parking lot. The remaining facts conveyed by the anonymous caller, such as the number of occupants in the car, their race, and that one of them was wearing a hooded sweatshirt, could not be confirmed because the darkly tinted windows precluded the officers from seeing inside the vehicle.

Even if the law enforcement officers here had been able to verify all of the "innocent" details provided by the anonymous caller, however, the distinction *Clipper* drew between gun and drug cases ignores the violence associated with drug dealing and the corresponding threat that this violence poses to innocent bystanders and law enforcement officers. Indeed, in *United States v. White*, 648 F.2d 29 (D.C.Cir.), *cert. denied*, 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233, 235 (1981), the same Court of Appeals that decided *Clipper* took note of this violence and rejected the argument "that narcotics violations do not justify police action on the basis of anonymous information ... because they involve no risk of 'serious personal injury or

---

5. The issue whether police officers should have the right to make such a forcible stop requires a careful analysis of the considerations applicable to administrative stops. *See, e.g.,* 4 Wayne R. LaFave, *Search & Seizure,* § 10.8(f), at 96–102 (2d ed. 1987); *United States v. Villamonte–Marquez,* 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983) (holding that, under certain circum-

stances, law enforcement officials may conduct a forcible stop in the absence of reasonable suspicion); *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (same). Because the holding here does not turn on the resolution of this issue, it is not necessary to engage in such an exercise here.

grave irreparable property damage.' " *Id.* at 36 n. 33. The Court of Appeals for the Second Circuit has also "repeatedly acknowledged the dangerous nature of the drug trade and the genuine need for law enforcement agents to protect themselves from the deadly threat it may pose." *United States v. Alexander,* 907 F.2d 269, 273 (2d Cir.1990), *cert. denied,* 498 U.S. 1095, 111 S.Ct. 983, 112 L.Ed.2d 1067 (1991). *See United States v. Salazar,* 945 F.2d at 51 ("narcotics dealers frequently carry weapons"); *United States v. Salas,* 879 F.2d 530, 535 (9th Cir.), *cert. denied,* 493 U.S. 979, 110 S.Ct. 507, 107 L.Ed.2d 509 (1989) (proper to frisk one reasonably believed to be "a narcotics dealer"); *United States v. Gilliard,* 847 F.2d 21, 25 (1st Cir.1988), *cert. denied,* 488 U.S. 1033, 109 S.Ct. 846, 102 L.Ed.2d 978 (1989) (firearms "tools of the trade" of drug traffickers); *see also Michigan v. Summers,* 452 U.S. 692, 702, 101 S.Ct. 2587, 2593, 69 L.Ed.2d 340 (1981) ("search for narcotics is the kind of transaction that may give rise to sudden violence").

Under these circumstances, it does not seem tenable to suggest that the exigency presented by the anonymous tip here is any greater than a report that the suspect is involved with the sale of drugs. *United States v. White,* 648 F.2d at 34–36. More significantly, a holding that the safety measures taken here may be permitted on less than reasonable suspicion cannot be reconciled with the holdings of the Supreme Court.

In *New York v. Class,* 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986), the Supreme Court set out the factors that must be present to justify such safety measures. Summarizing prior holdings, Justice O'Connor there observed that "three factors" were common to the holdings in those cases and the *Class* case:

> All three of the factors involved in [*Pennsylvania v.*] *Mimms* [434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)] and [*Michigan v.*] *Summers* [452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981)] are present in this case: The safety of the officers was served by the governmental invasion; the intrusion was minimal; and the search stemmed from some probable cause focusing suspicion on the individual affected by the search.

*Class,* 475 U.S. at 117–18, 106 S.Ct. at 967–68. Pursuant to these criteria, law enforcement officers may open the doors to a car and order the occupants out, even if they do not have any reason to suspect the occupants are armed, if they have a basis for lawfully detaining them, e.g., probable cause to believe that a violation of law has taken place or reasonable suspicion sufficient to justify a forcible stop. *See Mimms,* 434 U.S. at 111 n. 6, 98 S.Ct. at 333 n. 6 (1977); *United States v. White,* 648 F.2d at 36–37 ("if the officers had sufficient cause to make a *Terry* stop . . . we cannot conclude that the officers orders to get out of the car for questioning were [in]compatible with an investigatory stop"); *United States v. Merritt,* 695 F.2d 1263, 1273 (10th Cir.1982), *cert. denied,* 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983)

The law enforcement officers here did not have reasonable suspicion, much less probable cause, to believe that a crime or other violation of law had been committed by the occupants of the Cadillac. Nor did they open the doors and order the occupants out of the car because it was safer than questioning them while they were seated inside the car. The occupants were removed from the car so that they could be frisked. This was more than a "minimal" intrusion. While the police acted out of an understandable concern for their safety, the Supreme Court has repeatedly refused to water down the rule that reasonable suspicion is required to justify a search or seizure undertaken for the protection of law enforcement officers.

Particularly apposite here are *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) and *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). In *Ybarra,* law enforcement officers obtained a search warrant to search a bar and the bartender based on a showing of probable cause to believe that the bartender was engaged in selling heroin. When they entered the bar, described by Chief Justice Berger as "a rather small, one room tavern", *id.* 444 U.S. at 97, 100 S.Ct. at 345 (Berger, C.J., dissenting), they found it occupied by 9–13 patrons whom they proceeded to pat

down. *Id.* at 88, 100 S.Ct. at 340. The Supreme Court held that, in the absence of reasonable suspicion that the individual frisked was armed, a frisk was not permissible. Notwithstanding the argument of the Chief Justice that, "[g]iven the setting and the reputation of those who trade in narcotics," the law enforcement officers might pay with their lives if they assumed that the occupants of the bar were "unarmed and not involved," *id.* at 97, 100 S.Ct. at 345, the Supreme Court held that "[t]he 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on the premises where an authorized narcotics search is taking place." *Id.* at 94, 100 S.Ct. at 343.

Similarly, in *Buie,* the Supreme Court held that, after the subject of an arrest warrant is apprehended in a home, law enforcement officers may not conduct a security sweep of other rooms in the absence of reasonable suspicion "that the area to be swept harbors an individual posing a danger to those on the arrest scene." 494 U.S. at 327, 110 S.Ct. at 1094–95. While the Supreme Court recognized that "[t]he risk of danger in the context of an arrest inside the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter," *id.* at 333, 110 S.Ct. at 1097–98, it rejected the argument that the danger inhering in an in-home arrest for a violent crime should obviate the need for reasonable suspicion:

> The State argues that "[o]fficers facing the life threatening situation of arresting a violent criminal in the home should not be forced to pause and ponder the legal subtleties associated with a quantum of proof analysis," Brief for Petitioner 23. But despite the danger that inheres in on-the-street encounters and the need for police to act quickly for their own safety, the Court in *Terry* did not adopt a bright-line rule authorizing frisks for weapons in all confrontational encounters. Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be

conducted. That approach is applied to the protective sweep of a house.

*Id.* at 334 n. 2, 110 S.Ct. at 1098 n. 2.

To the extent that the anonymous caller here focused suspicion on the occupants of the Cadillac, the law enforcement officers may have had "individualized suspicion". However, because they did not have reasonable suspicion, as that term was defined in *Alabama v. White,* the Supreme Court cases discussed above compel the rejection of the holding in *Clipper* that such reasonable suspicion is not required to justify the search and seizure here.

■ The United States Attorney, however, argues that law enforcement officers who feel they cannot take necessary precautions for their safety will not act at all on the basis of information of the kind provided here. This suggestion is not altogether accurate. There are many reported cases where investigations prompted by a tip from an anonymous source provided corroboration sufficient to justify a forcible stop and frisk. *See e.g., Salazar,* 945 F.2d at 50–51; *Ballou,* 403 F.2d at 986; *Gomez,* 597 A.2d at 885–86. Nevertheless, even if law enforcement officers cannot investigate effectively without making a forcible stop of a suspect, it would not provide justification for waiving the requirement of reasonable suspicion.

If an anonymous caller informed the police that a named individual resided at a particular address, that he was then present at his home and possessed a weapon which he used in drug trafficking from his home, the police would not be free to open the door to the house, enter without warning, and frisk the occupant merely because they verified the fact that the individual named in the tip resided at the address given by the caller. If the police did not feel they could safely knock on the door of the house and question the individual who answered, perhaps seeking permission to conduct a more intrusive investigation, then the alternative would be not to undertake such activity.

The invasion of privacy involved here is not as significant as the entry into a house, thus obviating the necessity for a search warrant or a showing of probable cause. In

the absence of reasonable suspicion, however, the police could not open the door of the vehicle and remove the occupants for the purpose of frisking them. If the law enforcement officers could not safely approach the car without engaging in such activity, the alternative was not to approach it at all. As Justice Scalia has written: "It may well be that, in such circumstances, no effective means [to investigate] short of a search exists. But there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." *Arizona v. Hicks*, 480 U.S. 321, 329, 107 S.Ct. 1149, 1155, 94 L.Ed.2d 347 (1987).

*Clipper* suggests that where an anonymous source "provides the police with verifiable facts while alerting them to an imminent danger that the police cannot ignore except at risk to their personal or the public's safety," *Clipper*, 973 F.2d at 950–51, they may act to prevent that danger even where the evidence would not otherwise suffice to establish probable cause or reasonable suspicion. There is no need to quarrel with this suggestion. "No one would seriously question the authority of the police to detain for investigation an individual who was reported by an anonymous informant to be planning to bomb an airplane and who appears at the airport carrying a suitcase." Wayne R. LaFave, *"Street Encounters" And The Constitution: Terry, Sibron, Peters & Beyond*, 67 Mich.L.Rev. 40, 78 (1968). Similarly, as Justice Jackson observed in *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949):

> If ... a child is kidnapped and the officers throw a roadblock about the neighborhood and search every outgoing car, it would be a drastic and undiscriminating use of the search. The officers might be unable to show probable cause for searching any particular car. However, I should candidly strive hard to sustain such an action, executed fairly and in good faith, because it might be reasonable to subject travelers to that indignity if it was the only way to save

a threatened life and detect a vicious crime."

*Id.* at 183, 69 S.Ct. at 1314 (Jackson, J., dissenting). There were no such exigent circumstances suggested by the anonymous caller here.

The argument that an anonymous report of "a man with a gun" constitutes an exigent circumstance that makes reasonable an otherwise unreasonable search and seizure brings to mind Justice White's admonition in an analogous context. Specifically, in a case involving efforts to stem the tide of illegal immigration, he observed that "the Judiciary should not strain to accommodate the requirements of the Fourth Amendment to the needs of a system which at best can demonstrate only minimal effectiveness as long as it is lawful for business firms and others to employ aliens who are illegally in the country." *United States v. Brignoni–Ponce*, 422 U.S. 873, 915, 95 S.Ct. 2574, 2598, 45 L.Ed.2d 607 (1975) (White, J., concurring). These cautionary words are appropriate equally to the present case.

There are more than 200 million handguns and other lethal firearms in circulation in the United States. More than 4.2 million firearms are added to that total each year. *See* Peter Applebome, *Verdict in Death of Student Reverberates Across the Nation*, N.Y. Times, May 26, 1993, p. A14, col. 5–6 (hereafter "Applebome"). The stream of interstate commerce overflows with everything from Saturday Night Specials to assault rifles. *See e.g.*, Alix M. Freedman, *Behind the Cheap Guns Flooding the Cities is a California Family*, Wall St. J., February 28, 1992, p. A1, col. 6. These weapons caused some 37,000 gunshot deaths in the United States in 1990 and approximately 259,000 non-fatal injuries.[6] Of the 37,000 killed, 4,200 were teenagers. Indeed, firearms were responsible for more deaths than all natural causes among teenagers and young adults. *See* Lois A. Fingerhut, *Firearm Mortality Among Children, Youth, and Young Adults 1–34 Years of Age, Trends and Current Status: United*

---

6. The statistic relating to the number of deaths was provided informally by the National Center for Health Statistics, Center for Disease Control. The statistic relating to the number of non-fatal

injuries is derived by multiplying the number of deaths by seven. *See* Applebome, *supra*, at A1 ("guns cause approximately seven times as many non-fatal injuries as deaths").

*States, 1985–1990* 1, 3 (National Center for Health Statistics Pub. No. 231, 1993).

These statistics paint a frightening picture. The problem they depict, however, derives from the ease with which anyone can acquire a gun and "not because of the Fourth Amendment." *Adams v. Williams,* 407 U.S. 143, 150, 92 S.Ct. 1921, 1925, 32 L.Ed.2d 612 (1972) (Douglas, J., dissenting). Indeed, the Supreme Court has strained repeatedly to accommodate the requirements of the Constitution to the needs of law enforcement. See *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). The manner in which it has done so would have surprised "the fiercely proud men who adopted our Fourth Amendment." *Minnesota v. Dickerson,* — U.S. —, —, 113 S.Ct. 2130, 2135, 124 L.Ed.2d 334 (1993) (Scalia, J., concurring). The problem will not be solved or alleviated by watering down further "the right of the people to be secure in their persons ... against unreasonable searches and seizures."

*Conclusion*

Accordingly, for the foregoing reasons, I grant the defendant's motion to suppress the evidence obtained as the result of the search and seizure that took place on November 20, 1992.

SO ORDERED.