United States Court of Appeals,

Eleventh Circuit.

No. 94-4104.

UNITED STATES of America, Plaintiff-Appellee,

v.

Oliver L. GIBSON, Defendant-Appellant.

Sept. 19, 1995.

Appeal from the United States District Court for the Southern District of Florida. (No. 93-375-CR), Edward B. Davis, Judge.

CORRECTED OPINION

Before COX, Circuit Judge, HILL and REYNALDO G. GARZA [*], Senior Circuit Judges.

REYNALDO G. GARZA, Senior Circuit Judge:

On August 10, 1993, a federal grand jury returned a one count indictment against Oliver L. Gibson ("Gibson") for being a convicted felon in knowing possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Gibson pled not guilty to the charge and filed a motion to suppress the firearm. The district court denied the motion, finding that public policy permits the stop and frisk of an individual when police have a partially corroborated anonymous tip that the individual has a firearm.[1]

On November 8, 1993, Gibson was tried and convicted by a jury of his peers and was subsequently sentenced to a fifteen year imprisonment term, five years of supervised release, and a $50

---

[*]Honorable Reynaldo G. Garza, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

[1]Gibson also filed a motion to suppress certain statements made to the police officers after his arrest. This motion was denied as well. He does not appeal the denial of that motion.

special assessment. Gibson appeals both the district court's failure to suppress the physical evidence and the sentence it imposed. For the reasons discussed below we affirm the district court's judgement.

BACKGROUND

On the evening of February 28, 1993, the Miami Police Department received an anonymous telephone call informing it that two African-American men at Tiny's Bar were believed to be armed. Although it was unknown at that time, the call was placed by the bar's manager.[2] She described one of the individuals as wearing beige pants and a white shirt and the other as wearing a long black trench coat. Police Officers J.R. Green ("Green") and Kevin McNair ("McNair") arrived at the scene between one and two and a half minutes after the phone call was received.

The officers observed an African-American male, wearing beige pants and a white shirt, standing outside the club. After Officer Green made eye contact with him, the subject walked quickly from the bar. The officers were unable to stop or apprehend him.[3] The officers then entered the bar and scanned the room. They quickly established that Gibson, an African-American male, was the only individual wearing a long black trench coat and therefore

---

[2]Although the manager did not actually observe the two men with firearms, she believed they were armed because a bar patron told her as much.

[3]The officers explained that a median divided the street where the bar was located. When they first observed the suspect, they were on the street opposite the bar. Thus, to reach the bar, they had to drive to the end of the block and make a U-turn around the median. By the time they finally reached Tiny's Bar, the individual had walked away.

approached him.  Both officers testified that Gibson, who had his back to them, turned to face them and simultaneously reached behind his back with both hands.  At that point, Officer Green unholstered his weapon and pointed it at Gibson while explaining that he was believed to be carrying a firearm.  Officer McNair frisked Gibson, felt a hard bulge in the right trench coat pocket, and removed the object.  It was an ammunition clip.  Officer Green re-holstered his weapon, frisked Gibson, and removed a firearm from his back waist area underneath the trench coat.  Gibson was placed under arrest.

The officers testified that, when they entered Tiny's Bar, they had no facts on which to base the investigatory stop and frisk apart from the information provided by the anonymous caller. However, Officer McNair did testify that he knew weapons were common in the area.  Officer McNair also testified that though he was not afraid of Gibson, he nevertheless unfastened the safety snap on his holster when he approached him.  Officer Green, on the other hand, testified that he felt fear and apprehension as he approached Gibson due to the fact that he was allegedly armed. Furthermore, as we already noted, both officers testified to Gibson's reaction when he was confronted.

DISCUSSION

I.

Gibson states that the anonymous tip did not exhibit sufficient indicia of reliability to justify the stop and frisk. He argues that the information provided by the tipster was vague and relayed nothing more than easily obtained facts, that is, a description of the clothes worn by Gibson and the second

individual.  He alleges that the anonymous information failed to predict his future behavior and that the officers failed to conduct an independent investigation to corroborate the information provided by the anonymous caller.  Gibson adds that he did not do anything suspicious at the bar that would lead the officers to believe the tipster's information was reliable.  Accordingly, he maintains that the evidence should be suppressed on the ground that it was the fruit of an unlawful stop and frisk because it was made without reasonable suspicion.

The Supreme Court addressed the reliability of anonymous tips in *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).  In that case, the Montgomery Police Department had received an anonymous phone call stating that a woman would be leaving 235-C Lynwood Terrace Apartments at a particular time.  The caller predicted that she would drive a brown Plymouth station wagon with a broken right taillight lens, that she would drive to Dobey's Motel, and that she would be in possession of a brown attachè case containing approximately one ounce of cocaine.  Two officers proceeded to the Lynwood Terrace Apartments and established surveillance on the defendant's apartment.  At the designated time, the officers observed a woman, with nothing in her hands, exit the building and leave in the station wagon.  The officers followed the vehicle, but stopped the driver before she reached the Dobey Motel and informed her of their suspicions.  The officers obtained her permission to search the car and found a brown attachè case.  After the woman provided the officers with the combination to the case, marijuana was discovered.  She was placed

under arrest. Additionally, while the defendant was being processed at the police station, officers discovered three milligrams of cocaine in her purse. The defendant attempted to suppress the marijuana and cocaine but the motion was denied by the district court. This ruling was later reversed by the Court of Criminal Appeals of Alabama on the basis that the officers did not have the reasonable suspicion necessary to justify the investigatory stop. The Supreme Court granted certiorari.

After reviewing the totality of the circumstances, the Court held that the independently corroborated anonymous tip exhibited sufficient indicia of reliability to justify an investigatory stop of the defendant's vehicle. *Id.* at 332, 110 S.Ct. at 2417. The Court reasoned that the "independent corroboration by the police of significant aspects of the informer's predictions imparted some degree of reliability to the other allegations made by the caller." *Id.*[4] The Court also believed it important, as in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (dealing with anonymous tips in probable cause context), that

> "the anonymous [tip] contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." [ *Gates* ], at 245, 76 L.Ed.2d 527, 103 S.Ct. 2317. The fact that the officers found a car precisely matching the caller's description in front of the 235 building is an example of the former. Anyone could have "predicted" that fact because it was a condition presumably existing at the time of the call. What was important was the caller's ability to predict respondent's *future behavior,* because it demonstrated inside information—a

---

[4]The Court noted that not all of the tipster's facts were corroborated. For example, the police did not see the woman leave the particular apartment described, she was not carrying an attaché case, and the police stopped her before she actually reached the motel.

special familiarity with respondent's affairs. The general public would have had no way of knowing that respondent would shortly leave the building, get in the described car, and drive the most direct route to Dobey's Motel. Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities. *See id.* at 245, 76 L.Ed.2d 527, 103 S.Ct. 2317. When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop.

*White,* 496 U.S. at 332, 110 S.Ct. at 2417 (original emphasis). The Court concluded that the stop was justified, though, admittedly, it was a "close call." *Id.* Therefore, the Court established that anonymous tips corroborated by independent police work can be reliable enough to provide reasonable suspicion to make investigatory *Terry*[5] stops.

This Circuit has not squarely addressed the extent to which a tipster must detail the facts relating to an individual before the information given becomes sufficiently "reliable" to justify an investigatory stop and frisk under *White.* More importantly, we have not addressed the issue in this particular context, i.e., where the police receive an anonymous phone call detailing innocent details and warning of an armed or potentially armed individual. However, at least two of our sister courts have addressed this issue. We turn to these courts for guidance.

In *United States v. Clipper,* 973 F.2d 944 (D.C.Cir.1992), *cert. denied,* --- U.S. ----, 113 S.Ct. 1025, 122 L.Ed.2d 171 (1993), the police department received an anonymous telephone call

---

[5]*Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

reporting that an armed African-American male was in a particular area.  According to the caller, the individual was wearing a green and blue jacket and a black hat.  Two officers responded immediately to the tip.  After they arrived at the designated area, they observed an individual matching the description of the suspect.  The officers detained him and performed a protective frisk.  Although no firearm was recovered, they discovered a wad of currency and a bag of crack cocaine.  The suspect was arrested for possession of a cocaine substance with the intent to distribute.

The district court upheld the investigatory stop and the defendant was convicted.  On appeal the defendant argued, among other things, that the anonymous tip did not provide the police with reasonable suspicion to stop him.  Specifically, he argued that *Alabama v. White* required an anonymous tip to contain information predicting future behavior and that the police confirm the accuracy of the prediction before they assumed the tip was sufficiently reliable to act upon.  *Id.* at 949.  Thus, the defendant maintained that the evidence seized should have been suppressed.

The *Clipper* Court reviewed *White* and stated,

[w]hile it is true that the Court said, in that case, that the police's ability to corroborate the informant's predictions was important, *Alabama v. White* does not establish a categorical rule conditioning a *Terry* stop (when police are acting on an anonymous tip) on the corroboration of predictive information.  The Supreme Court in that case dealt with information that a particular individual was in possession of drugs, not of a gun....  We believe that the totality of the circumstances to which the Court refers in *Alabama v. White* must include those in which the anonymous informant makes no predictions, but provides the police with verifiable facts while alerting them to an imminent danger that the police cannot ignore except at risk to their personal or the public's safety.

*Clipper,* 973 F.2d at 949-950. Then, after reviewing worrisome statistics on firearm related fatalities, the court balanced the hazards that firearms present to the public and to the government's law enforcement officers against the public's interest in remaining free of unreasonable governmental intrusions. *Id.* at 951. The court ultimately concluded that the government's intrusion into an individual's privacy was outweighed by the dangers inherent in situations involving firearms:

> This element of imminent danger distinguishes a gun tip from one involving possession of drugs. If there is any doubt about the reliability of an anonymous tip in the latter case, the police can limit their response to surveillance or engage in "controlled buys." Where guns are involved, however, there is the risk that an attempt to "wait out" the suspect might have fatal consequences.
>
> Here, as in [*United States v. McClinnhan,* 660 F.2d 500 (D.C.Cir.1981) ], the police received an anonymous tip providing a detailed description of the appearance, clothing, and location of a man who allegedly possessed a weapon. Officers at the scene were able to corroborate all the innocent details of the tip. In these circumstances, ... a reasonable trier of the facts could find that the officers had a reasonable suspicion sufficient to justify a *Terry* stop and search.

*Id.* at 951.

The Second Circuit followed *Clipper* to uphold the investigatory stop of a vehicle prompted by an anonymous telephone call. *United States v. Bold,* 19 F.3d 99 (2d Cir.1994). In that case, the police department received an anonymous tip that there was a gray four-door Cadillac at the White Castle restaurant parking lot with four African-American males, one of whom was armed with a gun. The armed man was reported to be 21 years old and wearing a hooded sweater. Five police officers quickly responded to the call and found a four-door gray Cadillac parked at the

specified location.  One of the police officers approached the vehicle from the rear, opened the back door, and looked in.  The officer found two African-American men in the front seat of the car and asked them to step out.  The officer observed money on the passenger's lap and saw money fall from under his shirt as he stepped out of the vehicle.  The passenger was frisked, but no weapon was recovered.  The driver was also removed from the car and frisked, but again, no weapon was found.  Upon a closer inspection of the vehicle, however, the officers discovered $100 bills and a plastic toy gun.  An officer recalled a robbery earlier that day and radioed in for a description of the robbers.  The driver fit one of the descriptions reported.  The officers also learned that a robber had worn a tweed coat and carried a briefcase, two items found in the car.  The suspects were arrested and indicted for bank robbery.

The defendants moved to suppress the physical evidence seized on the ground that the search and seizure was made without reasonable suspicion.  The district court suppressed the evidence, holding that an anonymous tip under *White* would not provide reasonable suspicion if it was corroborated only by "easily obtained facts and conditions existing at the time of the tip" and that "independent corroboration by the police of significant aspects of the informer's predictions was required." *Bold,* 19 F.3d at 101 (quoting *United States v. Bold,* 825 F.Supp. 25, 28 (E.D.N.Y.1993)).

On appeal the Second Circuit held that the officers had a reasonable suspicion to stop and search the individuals and thus

reversed the suppression of the evidence.  The court reasoned that though the anonymous tip did not provide sufficient information by itself to conclude that the caller was honest or the information reliable, the officers were able to corroborate the tipster's information concerning the car and its location, thus supporting the reliability of the tip.  *Id.* at 103.  The officers' suspicions were also raised due to the car's darkly tinted windows and its remote location.  *Id.*  The panel concluded that the officer's independent corroboration of the anonymous tipster's information, the remote location of the car in the lot, the inability to see through the tinted windows, together with the report of a firearm, was sufficient to allow the officers to perform a *Terry* stop.  *Id.*

The court stated that the fact that no future events were predicted by the caller did not render the stop unlawful:  "There was no need here for any predictions of future conduct, because when verified by the officers, the tipster's information was sufficient under *Terry* to warrant investigation."  *Id.* at 103-04.  It found that *White* did not preclude the police from "acting on an anonymous tip when the information to be corroborated refer[ed] to present rather than future actions."  *Id.* at 104 (citing *United States v. Clipper,* 973 F.2d 944, 949 (D.C.Cir.1992), *cert. denied,* --- U.S. ----, 113 S.Ct. 1025, 122 L.Ed.2d 171 (1993)).  *White* was also distinguished on the facts because the *Bold* Court considered anonymous gun tips to be significantly different from drug tips—an officer dealing with a suspect who may possibly be armed may either frisk the individual or wait until the weapon is used or brandished, while a suspected drug dealer may be placed under

surveillance until the officer observes sufficient facts to take action. *Id.* Thus, the court decided that "[w]here the tip concerns an individual with a gun, the totality-of-the-circumstances test for determining reasonable suspicion should include consideration of the possibility of the possession of a gun, and the government's need for a prompt investigation." *Id.*

In the case at bar, Officers Green and McNair independently corroborated all the information that the anonymous tipster relayed. When the officers arrived at the scene they witnessed a person matching the description of one of the potentially armed men, in other words, the individual was of the race specified and wore the clothing described. Suspiciously, once they made eye contact with him he walked quickly from the bar. After they entered the club, the officers immediately established that only Gibson, an African-American male, wore a long black trench coat. As the officers approached Gibson, he reached behind his back with both hands. Although these details were innocent, once they were corroborated they added credibility to the anonymous tip.[6]

---

[6]Gibson claims that the officers only had the tipster's innocent information on which to base their stop and frisk. So, even if this information was corroborated, he alleges that it was insufficient to justify the officers actions. Gibson cites *United States v. McLeroy,* 584 F.2d 746 (5th Cir.1978), to support his argument. In *McLeroy,* a confidential informant, whose reliability was not established at trial, reported that McLeroy was in possession of a stolen vehicle and might have been involved in a hit-and-run accident. The stolen car was described as a black and white Chevrolet, with 1977 Alabama license tag BMB 023, and was parked at 1720 27th Street in Ensley, Alabama. The informant also stated that McLeroy might be in possession of a sawed-off shotgun. Two officers acted on the information and drove to McLeroy's house. They verified the description of the car and established surveillance on the house. After several

The officers also reached the bar no more than two and a half minutes after the call was received. The timing of their arrival ensured that the reported information was still fresh, increasing the chance that the officers would confront the potentially armed individual before any violence broke out, while also reducing the possibility that the officers would mistakenly detain the wrong person. Thus, we agree with both *Clipper* and *Bold* that *White* does not prevent law enforcement officers from relying and acting on

hours passed, McLeroy left the house, got into the car, and drove away. The officers followed McLeroy and stopped him. They checked the vehicle's identification number and established that the car was stolen. After conducting an inventory search of the vehicle, a sawed-off shotgun was discovered.

This Court found that the investigatory stop was not justified, concluding that "[r]easonable suspicion requires more than this minimal corroboration of innocent details." *Id.* at 748. The only elements of the tip independently corroborated by the police were innocent details and did not suggest that the "informant could have known more personal facts about McLeroy, such as whether he was involved in crime." *Id.* The corroboration was insufficient to believe that the information was reliable. *Id.* However, the *McLeroy* court then added that "[i]n some cases, corroboration of innocent details might change an otherwise insubstantial tip into a proper basis for a reasonable suspicion of criminality." *Id.* This is one of those cases.

The instant case is distinguishable from *McLeroy* because the tips involve two unrelated situations. Unlike our case, the tip in *McLeroy* was not contemporaneous, i.e., the tip did not reflect an on-going danger that required immediate police action. Instead, the police had ample time to set up surveillance and wait for several hours before they stopped McLeroy's vehicle. Moreover, in *McLeroy,* there was no immediate threat to the safety of the public. In the instant case, besides the safety of the officers, the safety of 20 to 40 innocent bar patrons was at stake. Officers Green and McNair did not have the luxury of waiting for the defendant to brandish or use a firearm before acting. They had no option but to act quickly and carry out the investigatory stop. Therefore, the nature of this tip, combined with the independent corroboration of innocent details, provided the officers with reasonable suspicion.

anonymous tips when the information to be corroborated does not refer to future actions but instead details present circumstances. *United States v. Bold,* 19 F.3d 99 (2nd Cir.1994) ("There is nothing in *White* that precludes police from acting on an anonymous tip when the information to be corroborated refers to present rather than future actions."); *United States v. Clipper,* 973 F.2d 944, 949 (D.C.Cir.1992) ("*Alabama v. White* does not establish a categorical rule conditioning a Terry stop (when police are acting on an anonymous tip) on the corroboration of predictive information."), *cert. denied,* --- U.S. ----, 113 S.Ct. 1025, 122 L.Ed.2d 171 (1993). The police officers were compelled to act immediately upon their arrival at Tiny's Bar.

More importantly, the anonymous tip concerned the presence of two potentially armed individuals in a public establishment. This fact raised the stakes for the officers involved because they not only had to worry about their own personal safety, but that of the 20 to 40 innocent bystanders who were also present. In *Terry v. Ohio,* the Supreme Court held that a law enforcement officer, during the course of an investigatory stop, may conduct a "reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual...." 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968). The test is "whether a reasonably prudent man in the circumstance would be warranted in the belief that his safety or that of others was in danger." *Id.* (citations omitted). In determining whether the officer acted reasonably under the circumstances, "due weight must be given, not to his inchoate and

unparticularized suspicion or "hunch,' *but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."* *Id.* (citations omitted) (emphasis added). Before upholding the stop, the Court also

> weigh[ed] the interest of the individual against the legitimate interest in "crime prevention and detection," ... and the "need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest."

*Michigan v. Long,* 463 U.S. 1032, 1047, 103 S.Ct. 3469, 3479, 77 L.Ed.2d 1201 (1983) (quoting *Terry,* 392 U.S. at 22, 88 S.Ct. at 1880). Thus, by allowing the stop and frisk of potentially armed individuals, the Court demonstrated an overriding concern for both the public and the lives of peace officers. *See Terry,* 392 U.S. at 27, 88 S.Ct. at 1883.

Law enforcement officers are at greatest risk when dealing with potentially armed individuals because they are the first to confront this perilous and unpredictable situation.[7] A law enforcement officer "responding to a tip involving guns may take these hazards into consideration when balancing the suspect's interests against the "need for law enforcement officers to protect themselves and other prospective victims of violence[.]' " *Clipper,* 973 F.2d at 951 (quoting *Terry,* 392 U.S. at 24, 88 S.Ct.

---

[7]The D.C. and Second Circuits noted the alarming increase of firearms in our nations streets and the growing threat of violence faced by the public and our law enforcement officers. *See, e.g., United States v. Bold,* 19 F.3d 99 (2nd Cir.1994) (recounting number of firearms circulating in the Nation, New York City and firearm related fatalities and injuries); *United States v. Clipper,* 973 F.2d 944, 949 (D.C.Cir.1992) (discussing firearm related fatalities in the police force and citizenry), *cert. denied,* --- U.S. ----, 113 S.Ct. 1025, 122 L.Ed.2d 171 (1993).

at 1881).  Otherwise, an officer who corroborates every item of information reported by an anonymous tipster other than actual possession of a firearm is left with "an unappealing choice." *Id.* (quoting *United States v. McClinnhan,* 660 F.2d 500, 502 (D.C.Cir.1981)).  He must either stop and frisk the individual, or wait to see if he ultimately brandishes or uses the firearm. *Id.*

As the record demonstrates, Officer Green feared for his safety and drew his firearm as a consequence—"I had a certain amount of fear and apprehension because [Gibson] was supposed to be armed, and I have a family and I have to protect myself." Furthermore, the officers were cognizant of calls that were regularly received concerning individuals with firearms in that particular area.  Drawing from the facts known to them at that time and in light of their experience, Officers Green and McNair had a valid safety concern to warrant a stop and frisk under *Terry.*

After carefully balancing the dangers that firearms present to law enforcement officers and the general public against the citizen's privacy interests, we conclude that the stop and frisk was justified.  The totality of the circumstances, including the independently corroborated details, the suspicious activity outside the bar, the knowledge that guns were common in the area, and the contemporaneous report that two individuals were potentially armed, leads us to find that the officers had a reasonable suspicion sufficient to conduct a stop and frisk under *Terry.*[8]  The

_____

[8]We also note that Gibson was observed acting in a fashion that, to trained law enforcement officers, might well have been a corroboration of the information given in the tip.  If Gibson was, as the tipster had said, carrying a weapon, if might well be predicted that, when he perceived himself to be in peril, he

governmental intrusion upon the defendant's privacy interest was minimal and justified in this situation.

Although the potential for abuse of anonymous tips gives us pause, it does not provide grounds for this Court to hold otherwise. The state of Florida provides a significant deterrent against reporting false information to its law enforcement agencies and officers by making such acts punishable by law. FLA.STAT.ANN. § 365.171(16) (West 1995) (false "911" calls); *Id.* § 817.49 (false reports of commission of crimes to law enforcement officers). This deterrent increases the odds that an anonymous tip is legitimate.

## II.

A felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) is punishable by a maximum of ten years imprisonment. 18 U.S.C. § 924(a)(2). The sentence is subject to enhancement under 18 U.S.C. § 924(e)(1) if the defendant has been previously convicted of at least three violent felonies or serious drug offenses. Gibson argues that the government must elect the enhancement *and* give timely notice of its intent to do so before a sentence under § 924 may be enhanced. He states that due process does not allow the enhancement to occur automatically. And, because he did not receive notice of the government's intent to

---

would reach for the weapon—either for use of for reassurance of its presence. When he was confronted by Officer Green, Gibson reached behind his back, where concealed firearms might well be carried, tucked into the belt. As a person in a crowd might instinctively touch his wallet when warned of the presence of pickpockets, so might an armed felon instinctively reassure himself of the presence of his weapon when confronted by one he perceived to be a threat.

seek enhancement until the day of sentencing, [9] Gibson claims the government should be barred from electing the enhancement.

This Circuit recently addressed the above issues in *United States v. Cobia,* 41 F.3d 1473 (11th Cir.) (per curiam), *cert. denied,* --- U.S. ----, 115 S.Ct. 1986, 131 L.Ed.2d 873 (1995). This Court held that § 924(e) does not require the Government to affirmatively seek an enhancement:  "Because the statute clearly indicates that the intent of Congress was to require mandatory enhancement, we hold that sentence enhancement pursuant to § 924(e) should automatically be applied by the courts regardless of whether the Government affirmatively seeks such enhancement." *Id.* at 1475 (citations omitted).  Yet, because the case involved the entering of a guilty plea pursuant to a plea agreement, we required that the defendant be notified of the mandatory minimum and maximum penalty possible under § 924(e) as required by Fed.R.Crim.P. 11(c)(1). *Id.* at 1476.[10]  Furthermore, due process mandated that the defendant

---

[9]Gibson claims he was surprised to find that his sentence would be enhanced because the enhancement was not included in the first presentence report.  The enhancement first appeared in a revised presentence report, which was given to Gibson on the day of sentencing.

[10]The relevant section of this rule states that

> (c) ... Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and inform the defendant of, and determine that the defendant understands, the following:
>
> (1) the nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law ...

FED.R.CRIM.P. 11.

receive reasonable notice of and an opportunity to be heard concerning the prior convictions. *Id.*

After reviewing the facts, we concluded that the requirements of due process and the Federal Rules of Criminal Procedure were satisfied. For instance, the district court notified the defendant of the possibility of an enhancement during his plea agreement hearing and of the possible sentences that he could receive under § 924(e). *Id.* The defendant also received notice of the prior convictions to be used for enhancement purposes in the government's response to the district court's standing discovery order, filed before the plea hearing, and in the presentence investigation report, filed after the plea hearing. *Id.* Finally, Cobia had the opportunity to challenge the validity and applicability of the convictions at the sentencing hearing. *Id.*[11]

Because it is now settled that an enhancement under § 924(e) is mandatory and therefore automatic, the question remains whether Gibson received reasonable notice of his prior convictions and an opportunity to challenge them to satisfy due process.[12] Although the government listed only one prior conviction in the indictment to support its charge that Gibson was a convicted felon in possession of a firearm, like in *Cobia,* the government filed a

---

[11]Although *Cobia* did not define the breadth of these challenges, we now note that prior state convictions used for enhancement purposes may only be collaterally attacked when the convictions were obtained in violation of a defendant's right to appointed counsel, as established in *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). *Custis v. United States,* --- U.S. ----, 114 S.Ct. 1732, 128 L.Ed. 517 (1994).

[12]Because our case does not involve a plea agreement, Rule 11 of the Federal Rules of Criminal Procedure is inapplicable.

response to the district court's standing discovery order prior to sentencing. The response included a print-out of Gibson's criminal history and copies of each information and judgment filed in state court relating to three of Gibson's prior state convictions. In each instance, the judgment listed the attorney who accompanied Gibson at sentencing, thus precluding a claim that his right to counsel was violated. *See Custis v. United States,* --- U.S. ----, 114 S.Ct. 1732, 128 L.Ed. 517 (1994).

Furthermore, Gibson's attorney was unquestionably familiar with his client's criminal history since he filed a motion in limine to exclude evidence of other crimes. In this motion, counsel argued that "not one of Gibson's prior offenses had a significant characteristic in common with the offense charged in the instant matter. Accordingly, Gibson's prior crimes would not be relevant to the issues raised in this matter." This representation to the district court implied counsel's intimate knowledge of Gibson's prior crimes and convictions.

Moreover, before sentencing, Gibson's attorney recognized that the enhancement was indeed applicable. When Gibson's attorney received the first presentence report, he found it "somewhat strange" that it lacked the penalty enhancement; he believed that the report should have included one. [13] He called the probation office to inquire about the omission and was informed that the

---

[13]During sentencing counsel for the defendant stated "... I myself called the Probation Officer when I got my copy of the [presentence report] because I, too, found it to be somewhat strange and brought it to her attention at the potential demise of my client because I felt responsible that that document at least could have had an indication [of the enhancement] and didn't."

enhancement had not been included because it had not been elected by the government.  Consequently, a revised presentence report was issued which did reflect the enhancement under § 924(e)(1).  In light of these facts, Gibson cannot claim any surprise as the enhancement was expected from the onset.

Despite Gibson's arguments to the contrary, it is clear that he had reasonable notice of his prior convictions and knew that the enhancement was applicable to him.  Therefore, we find that Gibson's due process rights were not violated.

                              CONCLUSION

We have carefully considered the arguments presented and find there is no basis on which to suppress the evidence nor disturb the defendant's sentence.  Therefore, the judgment below is

AFFIRMED.